**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 27, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

DAVID WALKER, for himself and as
next best friend for Cadin Wayne
Walker, McKaela Tandi Walker and
Andrew Walker; DEBBIE WALKER,
for herself, as Personal Representative
of the Estate of David Walker, as next
best friend for Cadin Wayne Walker,
McKaela Tandi Walker and Andrew
Walker; PATTI WALKER
STRATTON; CHAD STRATTON;
TYREE LAMPH, individually, and for
and on behalf of Dakota ("Cody")
Lamph; AMY MELISSA LAMPH,
individually, and for and on behalf of
Dakota ("Cody") Lamph,

      Plaintiffs-Appellees,

  v.

CITY OF OREM, a Utah municipality;
HAROLD PETERSON, Officer;
CITY OF PLEASANT GROVE, a
Utah municipality; JOHN CLAYTON,
Officer; B. J. ROBINSON, Officer;
GORDON SMITH, officer of the
Department of Public Safety, Orem
City, individually, UTAH COUNTY;
DAVID BATEMAN, Sheriff of Utah
County, in his official and individual
capacity; DARIN DURFEY,
Detective; PATTY JOHNSTON,
Detective; TOM HODGSON,
Detective,

No. 04-4140
(D.C. No. 2:02-CV-253-TS)
(D. Utah)

Defendants,

and

JERRY MONSON, Sgt.; MERET LANCE MCDANIEL, Deputy, all of the Utah County Sheriff's Department, in their individual capacities,

Defendants-Appellants.

DAVID WALKER, for himself and as next best friend for Cadin Wayne Walker, McKaela Tandi Walker and Andrew Walker; DEBBIE WALKER, for herself, as Personal Representative of the Estate of David Walker, as next best friend for Cadin Wayne Walker, McKaela Tandi Walker and Andrew Walker; PATTI WALKER STRATTON; CHAD STRATTON; TYREE LAMPH, individually, and for and on behalf of Dakota ("Cody") Lamph; AMY MELISSA LAMPH, individually, and for and on behalf of Dakota ("Cody") Lamph,

Plaintiffs-Appellees,

v.

CITY OF OREM, a Utah municipality; CITY OF PLEASANT GROVE, a Utah municipality; JOHN CLAYTON, Officer; B. J. ROBINSON, Officer; UTAH COUNTY; DAVID BATEMAN, Sheriff of Utah County, in his official and individual capacity; JERRY MONSON, Sgt.; DARIN

No. 05-4016
(D.C. No. 2:02-CV-253-TS)
(D. Utah)

-2-

DURFEY, Detective; PATTY JOHNSTON, Detective; TOM HODGSON, Detective; MERET LANCE MCDANIEL, Deputy, all of the Utah County Sheriff's Department, in their individual capacities; GORDON SMITH, officer of the Department of Public Safety, Orem City, individually,

        Defendants,

   and

HAROLD PETERSON, Officer,

        Defendant-Appellant.

---

DEBBIE WALKER, as Personal Representative of the Estate of David Walker, and as next best friend for Cadin Wayne Walker, McKaela Tandi Walker and Andrew Walker; DAVID B. WALKER, for himself and as next best friend for Cadin Wayne Walker, McKaela Tandi Walker and Andrew Walker; TYREE LAMPH; AMY MELISSA LAMPH; PATTI STRATTON WALKER; CHAD STRATTON,

        Plaintiffs-Appellees,

  v.

OREM CITY, a Utah municipality; HAROLD PETERSON, Officer; PLEASANT GROVE CITY, a Utah municipality; B. J. ROBINSON,

No. 05-4025
(D.C. No. 2:02-CV-253-TS)
(D. Utah)

-3-

Officer; RICHARD CASE; UTAH
COUNTY; DAVID BATEMAN;
JERRY MONSON; MERET LANCE
McDANIEL; GORDON SMITH;
(FNU) GILBERT,

Defendants,

and

JOHN CLAYTON, Officer,

Defendant-Appellant.

DEBBIE WALKER, as personal
representative of the Estate of
David Walker, and as next best friend
for Cadin Wayne Walker, McKaela
Tandi Walker and Andrew Walker;
DAVID WALKER, SR., for himself
and as next best friend for Cadin
Wayne Walker, McKaela Tandi
Walker and Andrew Walker; TYREE
LAMPH, and AMY MELISSA
LAMPH, individually and on behalf of
Dakota ("Cody") Lamph; PATTI
STRATTON WALKER; CHAD
STRATTON,

Plaintiffs-Appellants,

v.

OREM CITY, a Utah municipality;
HAROLD PETERSON, Officer;
PLEASANT GROVE CITY, a Utah
municipality; JOHN CLAYTON,
Officer; B. J. ROBINSON, Officer;
RICHARD CASE; DAVID

No. 05-4038
(D.C. No. 2:02-CV-253-TS)
(D. Utah)

-4-

BATEMAN, Sheriff of Utah County,
in his official and individual capacity;
DARIN DURFEY; GORDON SMITH;
(FNU) GILBERT,

Defendants,

and

UTAH COUNTY; JERRY MONSON;
MERET LANCE McDANIEL,

Defendants-Appellees.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 2:02-CV-253-TS)**

---

Submitted on the briefs:[*]

Jesse C. Trentadue, Michael W. Homer, Suitter Axland, Salt Lake City, Utah for Defendants-Appellants in 04-4140, for Defendants-Appellees in 05-4038.

Margaret D. Plane, American Civil Liberties Foundation, Inc., Salt Lake City, Utah for Plaintiffs-Appellees in 04-4140, for Plaintiffs-Appellants in 05-4038.

Ralph E. Chamness, Lauren I. Scholnick, Erika Birch, Strindberg, Scholnick & Chamness, LLC, Salt Lake City, Utah for Plaintiffs-Appellees in 04-4140, 05-4016, 05-4025, and for Plaintiffs-Appellants in 05-4038.

---

[*]    After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore ordered submitted without oral argument.

Andrew M. Morse, Heather S. White, Snow Christensen & Martineau, Salt Lake City, Utah for Defendant-Appellant in 05-4016.

Peter Stirba, Gary R. Guelker, Stirba & Associates, Salt Lake City, Utah for Defendant-Appellant in 05-4025.

---

Before **HARTZ**, **EBEL**, and **McCONNELL**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

We have consolidated the present appeals for purposes of disposition. These appeals arise out of a police shooting in a rural area of American Fork, Utah, and the subsequent detention of witnesses to the shooting. The plaintiffs include Debbie Walker, mother and personal representative of the estate of David Walker who died in the shooting, and various other relatives of David Walker who have asserted claims arising out of the shooting and the subsequent detention.

In Case No. 04-4140, Officers Jerry Monson and Lance McDaniel of the Utah County Sheriff's Office appeal from the district court's order denying their motion to dismiss plaintiffs' complaint based on qualified immunity. Case No. 05-4038 is an appeal by the plaintiffs, who challenge the district court's grant of summary judgment based on qualified immunity to Officers Monson and McDaniel, and its grant of summary judgment to Utah County, on claims arising

out of their detention subsequent to the shooting. Cases 05-4016 and 05-4025 are brought, respectively, by Orem City Sergeant Harold Peterson and Pleasant Grove Officer John Clayton, the officers who shot and killed David Walker. They challenge the district court's denial of their motions for summary judgment based on qualified immunity.

We reverse the district court's denial of qualified immunity to Officers Monson and McDaniel in Case No. 04-4140, and remand for a grant of qualified immunity to those officers. In Case No. 05-4038, we vacate the district court's grant of summary judgment to officers Monson and McDaniel for lack of jurisdiction, but affirm the grant of summary judgment in favor of Utah County. We dismiss cases 05-4016 and 05-4025 in part for lack of appellate jurisdiction, and affirm in part.

Finally, we note that plaintiffs sued a number of defendants associated with the Utah County Sheriff's Office, including its sheriff, David Bateman, who was named in both his individual and official capacities. In a stipulated order dated July 6, 2004, all Utah County defendants except for Utah County and Officers Monson and McDaniel, were dismissed without prejudice.[1] Aplt. App., No. 04-4140, at 258-59. As we read this order, Sheriff Bateman was dismissed in

_____

[1] The notice of appeal that Officers Monson and McDaniel filed in Case No. 04-4140 included a number of Utah County related defendants as appellants. In reality, however, only Officers Monson and McDaniel are parties to the appeal, asserting qualified immunity. We have adjusted our caption accordingly.

both his individual and official capacities. Although the district court's subsequent summary judgment order purported to grant summary judgment in favor of the "Utah County Sheriff's Office," we understand its order to refer to defendant Utah County. Accordingly, in this opinion, we refer to the municipal entity to which summary judgment was granted, from which the plaintiffs now appeal, as "Utah County."

**FACTS**

While all of the appeals arise out of the same basic factual nexus, the significance of the operative facts differs according to the appellate context of each appeal.[2] We will therefore begin with a recitation of the basic facts contained in plaintiffs' district court complaints. Further facts developed during the summary judgment proceedings will then be presented in their appropriate context, as part of the analysis of particular claims.[3]

---

[2] In Case No. 04-4140, we are concerned only with the facts alleged in plaintiffs' complaint against Officers Monson and McDaniel. Although the defendants involved in Cases 05-4016 and 05-4025 purport to appeal based solely on issues of law, we lack jurisdiction to consider their appeals to the extent that they challenge the district court's determination that contested, material factual issues remain to be resolved. We evaluate the summary judgment facts in Case No. 05-4038 under traditional summary judgment standards, stated in the light most favorable to plaintiffs and drawing every reasonable inference in their favor.

[3] The orders giving rise to these appeals do not exhaust all of plaintiffs' claims against all of the defendants named in their complaints. The district court certified plaintiffs' appeal for immediate disposition in accordance with Fed. R. Civ. P. 54(b). Facts relevant to causes of action not at issue in this

(continued...)

Two complaints were filed in this action, No. 2:02CV-0253ST (the "shooting complaint"), naming the Cities of Orem, Pleasant Grove, and Lehi, and Officers Peterson, Clayton, Robinson, Smith, Terry and Munson, and No. 2:02CV-1427BSJ (the "detention complaint"), naming Utah County, various Utah County Sheriff's Department employees, Gordon Smith, and the City of Orem. The complaints were consolidated on plaintiffs' motion.

**The Shooting Complaint**

Plaintiffs allege that on December 28, 1998, David Walker took his sister Patti Walker Stratton's Subaru from the home of his parents David Walker, Sr. and Debbie Walker. After switching the license plates on the vehicle, he continued driving it. Later that day, he called his mother, Debbie Walker, and indicated that he was suicidal. In order to obtain assistance in locating her son from the Utah County Sheriff's Office, Debbie Walker reported the vehicle as stolen.

The next day, David again called his mother at home and again reported he was suicidal. Law enforcement assisted family members in tracing the call to a gas station in Orem, Utah. Orem officers responded to the identified location but David Walker eluded them.

---

[3](...continued)
appeal are omitted.

Officers Peterson of Orem and Clayton of Pleasant Grove thereafter became involved in pursuing David through several municipal and Utah County jurisdictions. Initially, the Orem police dispatch reported that David was a threat to his family and others; this, however, was later corrected to report that he was merely a danger to himself. The Utah County Sheriff's office channel reported that David was unarmed and was going to his parents' home.

David arrived in the driveway of the rural Walker residence, followed by Officers Peterson and Clayton.[4] Plaintiffs allege that this parking area was "well-lit by a full moon, a large barn outdoor light," a porch light, and Christmas lights. Aplt. App., No. 04-4140, at 51. They also assert that David left his brights on when he exited the Subaru and that he stood a short distance in front of the vehicle, holding a small, two-inch blade knife against his wrist. Additional illumination was provided at the scene by the red and blue warning lights on Peterson's vehicle, and the headlights from both Clayton and Peterson's vehicles.

Plaintiffs assert that both officers had turned off their sirens when they came down the driveway. While Peterson "shouted instructions to Clayton that could be heard in the night's silence" he allegedly did not provide any warning or instructions to David. *Id.* at 52. Peterson drew his .45 caliber firearm, told Orem dispatch he was exiting his vehicle, and shot David Walker twice from a distance

---

[4] The rural drive leading to the Walker residence also led to the nearby, separate residence of plaintiffs Tyree and Amy Lamph.

of twenty-eight feet. Plaintiffs allege that Clayton then shot David Walker two more times with his .40 caliber weapon while David was lying on the ground, from a distance of approximately twenty to twenty-five feet.

After the shooting, David's mother Debbie Walker and his sister Patti Walker Stratton were standing on the front porch of the Walker home. Officers on the scene would not permit them to go to David. Officer B.J. Robinson ordered them to get down and simultaneously grabbed Debbie Walker and pulled her down the concrete stairs outside the home, seriously injuring her shoulder. He then pulled Patti Walker Stratton down on top of Debbie Walker. Robinson and Clayton then thrust their weapons into Debbie and Patti's faces, terrifying them.

**The Detention Complaint**

In addition to the factual allegations recited in the shooting complaint, plaintiffs included the following allegations in their complaint against Utah County, officers of the Utah County Sheriff's Department (including officers Monson and McDaniel), Gordon Smith of the Orem City Department of Public Safety, and the City of Orem. After the shooting of David Walker, officers of the Utah County Sheriff's Department and Gordon Smith, who were armed and in uniform, required plaintiffs to remain in their home for questioning. Debbie Walker and Patti Walker Stratton had weapons pointed at their heads and were ordered into the Walker home at gunpoint. Plaintiff Tyree Lamph, David

Walker's brother-in-law, was detained in the back of a Utah County Sheriff's Department vehicle and then detained in the Walker residence. Plaintiffs did not consent to this detention, which lasted approximately one and one-half hours and prevented them from being with David Walker before he died.

## ANALYSIS

**Case No. 04-4140**

In Case No. 04-4140, the first appeal filed in this case, Officers Jerry Monson and Lance McDaniel of the Utah County Sheriff's Department appeal the district court's denial of their motion to dismiss, in which they asserted qualified immunity for their role in detaining certain family members of David Walker after the fatal shooting. "We review de novo a district court's ruling on qualified immunity." *Jones v. Hunt*, 410 F.3d 1221, 1225 (10th Cir. 2005). "Our threshold inquiry in the qualified immunity analysis is whether, taking [plaintiffs'] allegations as true, [officers Monson and McDaniel] violated [their] Fourth Amendment right to be free from unreasonable seizures." *Id.* "If we conclude that [plaintiffs have] alleged constitutionally impermissible conduct, [the officers] 'may nevertheless be shielded from liability for civil damages if [their] actions did not violate clearly established . . . constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

### 1. Threshold issue

The procedural posture of this appeal is complicated by the fact that the district court denied qualified immunity to Officers Monson and McDaniel on their motion to dismiss, but ultimately granted that relief in response to their motion for summary judgment. It denied the officers' motion to dismiss "because the right these Defendants are alleged to have violated was clearly established at the time of the incident in question." Aplt. App., No. 04-4140, at 250. After Monson and McDaniel renewed their qualified immunity argument on summary judgment, the district court correctly noted the plaintiffs' argument that it lacked jurisdiction to proceed because the officers had filed an interlocutory appeal. The district court concluded, however, that since its prior order and the officers' appeal concerned only whether the right allegedly violated was clearly established, it retained jurisdiction to determine whether the officers had violated the plaintiffs' constitutional rights. It then determined, for summary judgment purposes, that they had not.

Because of this unusual disposition, we encounter jurisdictional difficulties in reaching either of the district court's orders. The summary judgment ruling granting qualified immunity in favor of the officers may have mooted the denial of their motion to dismiss. On the other hand, once officers Monson and McDaniel took an appeal from the order denying their motion to dismiss based on qualified immunity, the district court may have lost jurisdiction to take further

-13-

substantive action relevant to them in the case.  *Stewart v. Donges*, 915 F.2d 572, 576 (10th Cir. 1990) ("[A]n interlocutory appeal from an order refusing to dismiss on . . . qualified immunity grounds . . . divests the district court of jurisdiction to proceed with any part of the action against an appealing defendant.").

The issue is somewhat clouded by language in *Stewart* indicating that the reason for the divestiture of jurisdiction is to protect *the right of a defendant* asserting qualified immunity to avoid further proceedings pending resolution of the appeal.  *See id*. at 575-76.  That rationale, strictly speaking, is not served here by divesting the district court of jurisdiction to enter summary judgment *in favor of* Officers Monson and McDaniel.  It was Monson and McDaniel, after all, who further invoked the jurisdiction of the district court in this case by filing a motion for summary judgment and by obtaining a favorable disposition on that motion while their appeal to this court was pending.  The decision to proceed with their motion for summary judgment paid off for them: the district court's order of summary judgment in their favor furthered, rather than hindered, their interest in avoiding a trial on the merits of plaintiffs' claims.[5]

_____

[5]     It is clear that a defendant may assert qualified immunity through a motion to dismiss, take an appeal from the denial of such a motion, and if the appeal is resolved unfavorably to him, renew the issue of qualified immunity by way of a motion for summary judgment, appealing once again, if necessary, from the denial of the summary judgment motion.  *See Behrens v. Pelletier*, 516 U.S. 299,

(continued...)

Did, then, the district court retain the power after the appeal was filed to rule in *favor of* the officers on qualified immunity? We think not. The filing of the notice of appeal was an event of jurisdictional significance, which divested the district court from granting further relief concerning the issues on appeal. *See Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982). We see no reason to depart from this rule, even where the relief granted favored the appealing party.[6]

This does not mean that a party, having filed a notice of appeal from the denial of a motion to dismiss on the basis of qualified immunity, has no option but to await the outcome of the appeal if facts subsequently emerge that it believes demonstrate its entitlement to summary judgment. An appealing party in that situation may seek to abate the appeal while requesting that we remand to the district court for consideration of a summary judgment motion. The officers have filed no such motions in this case, however, and our decision in their favor on

[5](...continued)
307-11 (1996) (rejecting Ninth Circuit's "one-interlocutory-appeal" rule). Here, however, the problem is that the defendants renewed the qualified immunity issue in the district court *prior to* the disposition of their earlier appeal.

[6]     We recognize that dicta in *McCauley v. Halliburton Energy Services, Inc.*, 413 F.3d 1158, 1162 n.1 (10th Cir. 2005), suggests the divestiture rule is based on considerations of judicial economy rather than jurisdiction. The statement in *McCauley*, is based on the opinion of one commentator on the law rather than authority from this circuit or the Supreme Court, was not essential to the outcome in that case, and does not dictate the outcome here.

-15-

their appeal from the motion to dismiss makes it unnecessary to consider whether we could or should grant such an abatement and remand *nunc pro tunc*.

It follows that the portion of the district court's order granting summary judgment to officers Monson and McDaniel, challenged in Case No. 05-4038, must be vacated for lack of jurisdiction. We proceed to consider the officers' appeal from the denial of their motion to dismiss.

## 2. Qualified immunity analysis

We now proceed to conduct the required de novo review of the district court's denial of the officers' motion to dismiss. Our review leads us to reach a disposition contrary to that of the district court. We conclude that taking the allegations of plaintiffs' complaint as true, they adequately alleged a violation by officers Monson and McDaniel of their Fourth Amendment right to be free from unreasonable seizures. We further conclude, however, that the contours of this right were not sufficiently established that a reasonable officer would have known that the detention was unlawful. We therefore reverse the denial of qualified immunity in favor of officers Monson and McDaniel, and remand with instructions to dismiss plaintiffs' complaint against them.

### a. Fourth Amendment violation

As noted, our threshold inquiry concerns whether, taking the allegations of plaintiffs' complaint as true, the officers violated the detained plaintiffs' Fourth Amendment rights. Plaintiffs' complaint is somewhat vague concerning the

specific, personal participation of officers Monson and McDaniel in detaining

plaintiffs. Plaintiffs do allege, however, that "all Defendants were armed, in

uniform, and required the Plaintiffs to remain in the residence . . . for

approximately one and one-half hours." Aplt. App., No. 04-4140, at 100. They

further allege that plaintiff Tyree Lamph was "unreasonably detained in the back

of a [Utah County Sheriff's Office] vehicle and then detained in the Walker

residence." *Id.*[7]

Plaintiffs do not assert that Monson and McDaniel arrested them. Nor were

they detained as suspects of a crime. The Fourth Amendment applies to their

detention, however, because:

> It is quite plain that the Fourth Amendment governs "seizures" of the
> person which do not eventuate in a trip to the station house and
> prosecution for crime – "arrests" in traditional terminology. It must
> be recognized that whenever a police officer accosts an individual
> and restrains his freedom to walk away, he has "seized" that person.

*Terry v. Ohio*, 392 U.S. 1, 16 (1968).

The question is whether the "seizure" involved was reasonable for Fourth

Amendment purposes. We note, at the outset, that defendants did not have a

---

[7] The facts alleged in plaintiffs' complaint, and some of their argument in the district court, suggest that they believed the officers had violated their constitutional rights in three ways: by using violence to subdue them and force them into the home, by entering their home without permission, and by forcing them to remain there. In this appeal, plaintiffs focus almost exclusively on the claim that they were unlawfully detained, using the facts about being forced into their home only to show that a seizure occurred. Accordingly, we confine our discussion to this claim.

"reasonable suspicion" that plaintiffs were involved with any criminal wrongdoing, and therefore had no right to subject them to an investigative detention. *See Cortez v. McCauley*, 438 F.3d 980, 991-92 (10th Cir. 2006). Instead, they have advanced two basic rationales for the seizure involved here. First, the seizure was reasonable as a means of obtaining information from, or interviewing, potential witnesses to a crime. Second, the seizure was reasonable as a means of securing a crime scene. We will consider each of these rationales in turn.

The detention of a potential witness to a crime must satisfy the Fourth Amendment's "reasonableness" requirement. *Illinois v. Lidster*, 540 U.S. 419, 426-27 (2004). In judging reasonableness, courts apply a balancing test that looks to "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown v. Texas*, 443 U.S. 47, 51 (1979).

As a general matter "[t]here is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets. Absent special circumstances, [however,] the person approached may not be detained or frisked but may refuse to cooperate and go on his way." *Terry*, 392 U.S. at 34 (White, J., concurring). What little authority exists on this question suggests that police have less authority to detain those who have witnessed a crime for investigatory purposes than to detain criminal suspects. 4 Wayne R. LaFave, *Search & Seizure:*

*A Treatise on the Fourth Amendment* § 9.2(a), at 289 (4th ed. 2004).

Accordingly, some courts have prohibited the involuntary detention of witnesses to a crime. *United States v. Ward*, 488 F.2d 162, 169-70 (9th Cir. 1973) (en banc); *United States ex rel. Hampton v. Fews*, 187 F. Supp. 2d 981, 988-90 (N.D. Ill.), *rev'd on other grounds*, 296 F.3d 560 (7th Cir. 2002); *Perkins v. Click*, 148 F. Supp. 2d 1177, 1184 (D.N.M. 2001); *Orozco v. County of Yolo*, 814 F. Supp. 885, 893 (E.D. Cal. 1993).

A recent Supreme Court decision, however, suggests that a brief detention of witnesses is in fact permitted, provided that it meets the reasonableness test in *Brown*. In *Lidster*, the Court upheld the use of a highway checkpoint at which officers briefly detained motorists to ask them for any information they might have about a fatal hit-and-run accident. The Court upheld the use of the checkpoint because, among other things, the stop posed only a minimal interference with the motorists' liberty, requiring only a brief wait in line, and provided little reason for anxiety or alarm. *Lidster*, 540 U.S. at 427-28.

In *Lidster*, the officers manning the checkpoint asked motorists in general to supply them with information, without knowing whether any motorist had the information sought. Here, by contrast, the officers had much greater reason to believe that one or more of the plaintiffs had specific information about the shooting in question. Thus, the seizure involved here advanced the public interest to a much greater degree than the roadblock involved in *Lidster*. *See Brown*,

-19-

443 U.S. at 51. This being the case, a longer detention than that involved in *Lidster* may have been reasonable. At a minimum, officers had a right to identify witnesses to the shooting, to obtain the names and addresses of such witnesses, and to ascertain whether they were willing to speak voluntarily with the officers. *Cf. Hiibel v. Sixth Judicial District Court*, 542 U.S. 177, 186-88 (2004) (stating suspect subjected to valid *Terry* stop may be required to disclose his name during the course of the stop).

Plaintiffs' primary objection to the detention here involves its allegedly excessive duration. We have located no federal court precedent establishing a specific time limit for witness detention. However, even if a brief detention could be justified in this case to attempt to obtain names and addresses of the witnesses (and statements if they were willing to provide them), a ninety-minute detention for this purpose was unreasonable. *See United States v. Place*, 462 U.S. 696, 709-10 (1983) ("[A]lthough we decline to adopt any outside time limitation for a permissible *Terry* stop, we have never approved a seizure of the person for the prolonged 90-minute period involved here and cannot do so on the facts presented by this case.") (footnote omitted). There is no indication in plaintiffs' complaint that any exigencies were present in this case, justifying the lengthy detention involved here for investigative purposes. We therefore conclude that the detention alleged in plaintiffs' complaint could not reasonably be justified using an investigative rationale.

The other rationale offered for the extended detention identified in plaintiffs' complaint is the need to establish control over the crime scene. The question is whether detaining plaintiffs in their home, and in particular, detaining them for ninety minutes as alleged in their complaint, could be considered "reasonable" as a means of controlling the crime scene.

We note that *detaining* the plaintiffs is a different matter from *excluding* them from the crime scene itself. Thus, even if plaintiffs had no right to cross the crime scene tape to be with David before he died, this does not necessarily mean that the police had the right to detain them, even in their own home.

The Supreme Court has recognized that detention or control of both suspects and non-suspects may be necessary to insure officer safety and to maintain the officers' control over a crime scene. Thus, officers conducting a *Terry* stop are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985). The detention of non-suspects incidentally present on the scene, in the interest of officer safety, should not ordinarily exceed in scope or duration that of the suspects directly targeted by the *Terry* stop itself. We have already held that *Terry*-style principles (which may be less directly applicable to witnesses, as opposed to suspects) cannot be used to justify the ninety minute detention plaintiffs allege in this case.

-21-

A more extensive detention may be permitted where officers have secured a valid search warrant, and they find non-suspects on the premises to be searched. In *Michigan v. Summers*, 452 U.S. 692 (1981), the Supreme Court permitted officers in such circumstances to detain the persons they found, and even to compel people outside the home to re-enter the premises and stay there, if necessary. The Court reasoned that "[t]he detention of one of the residents while the premises were searched, although admittedly a significant restraint on his liberty, was surely less intrusive than the search itself," for which a warrant had been obtained. *Id.* at 701. While the Court noted that "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation," *id.* at 702-03, we have found no case extending this principle outside the context of a search pursuant to a warrant or probable cause. Such circumstances are of course absent in this case.

In *United States v. Edwards*, 103 F.3d 90 (10th Cir. 1996), police pulled over an automobile containing a frequent visitor to a drug house, just prior to execution of a warrant at that house. They detained him at streetside for forty-five minutes, three blocks from the house, during which time he was handcuffed and guns were drawn. This court held that the extended detention had been illegal because (1) the defendant did not know the warrant was being executed, and had no reason to flee; (2) the police knew where he lived, and could have stopped him briefly, then tailed him; (3) the defendant admittedly posed no

-22-

risk of harm to them; and (4) his detention played no part in facilitating the search. *Id.* at 93-94. We ultimately upheld the defendant's conviction for other reasons, but opined that he "was illegally arrested during the approximately thirty minutes between the time when the police completed their [fifteen minute] '*Terry* search' of his person and vehicle, and the time when the discovery of [a drug lab at the residence] gave rise to probable cause for [his] arrest." *Id.* at 94.

Police officers may also conduct a "protective sweep" and limited search of a premises, incident to an arrest, to protect the safety of officers and others. *Maryland v. Buie*, 494 U.S. 325, 327 (1990). Such a sweep, however, may only be conducted if the officer reasonably believes that the area harbors an individual posing a danger to himself or others. *Id.* Moreover, the sweep must last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335-36. The extended detention at issue in this case cannot be justified as part of a protective sweep.[8]

---

[8]     We note that the facts developed for purposes of summary judgment include an uncontested assertion that plaintiff Tyree Lamph "grabbed a shotgun and stepped outside the Walker residence as the officers approached." Aplt. App., No. 05-4038, Vol. I, at 193. He later set the shotgun down, however, and it does not appear to have posed a continuing threat. Utah County also asserted that there were guns inside the Walkers' house, posing a safety issue for officers. *Id.* at 198-201. While this might explain the need for Officer McDaniel to remain just inside the threshold of the home, to insure officer safety during the time the detention took place (assuming his lawful entry into the home in the first place, a

(continued...)

-23-

Finally, in the exercise of their "community caretaking function," officers may occasionally find it necessary to detain individuals to prevent them from harming themselves or others. *United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993). Nothing in the evidence suggests that such a detention was reasonably necessary here.

In sum, based on the facts recited in plaintiffs' complaint, the lengthy detention alleged in this case was unreasonable and was not justified by either the need for investigation of a crime or control of a crime scene. Having concluded that plaintiffs have adequately alleged a violation of their Fourth Amendment rights, we turn to whether the legal rule protecting those rights allegedly violated by defendants was "clearly established" at the time of the events in question. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

**b. Clearly established law**

Whether a legal rule was clearly established at the time official action was taken "depends substantially upon the level of generality at which the relevant 'legal rule' is to be defined." *Id.* The Supreme Court has rejected an overly abstract approach to this issue, which would "destroy the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in

---

[8](...continued)
fact the plaintiffs dispute), neither his presence there nor the detention it facilitated could be justified for the extended length of time involved here.

public officials' effective performance of their duties." *Id.* (quotation omitted). Instead, it has adopted a more particularized approach to whether a right has been "clearly established," requiring that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640.

"This is not to say that an official action is protected . . . unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (citations omitted). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992).

Plaintiffs had the burden, in response to defendants' motion to dismiss, of articulating such clearly-established law. *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995). They assert that *Terry* itself provides an on-point Supreme Court decision. We cannot agree. The *Terry* court disclaimed any intention to go beyond the facts of that case and to set forth general principles governing "the constitutional propriety of an investigative 'seizure' upon less than probable cause for purposes of 'detention' and/or interrogation." 392 U.S. at 19 n.16. It

offers no direct guidance on the issue here, which is the outer contours of legally-permissible detention of witnesses.

We note, moreover, that to the extent an analogy to *Terry*-style principles is permissible to determine the reasonableness of the officers' actions here, such principles require us to balance competing interests. In assessing the reasonableness of a detention under *Terry*, "[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Place*, 462 U.S. at 703. We have stated that "allegations of constitutional violations that require courts to balance competing interests may make it more difficult to find the law 'clearly established' when assessing claims of qualified immunity." *Medina*, 960 F.2d at 1498.

While there were certainly some suggestions in the law prior to *Lidster* that the interrogation of witnesses was subject to Fourth Amendment constraints at least as stringent as those involving detention of suspects, we have found no pertinent Supreme Court or Tenth Circuit decision prior to the events in question, and no clearly established weight of authority from other courts, that would have made the unlawfulness of the officers' conduct apparent to them. In sum, "[t]he contours of the right [were not] sufficiently clear that a reasonable official would understand that what he [was] doing violate[d] that right." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (quotation omitted). We therefore reverse the district

court's order denying qualified immunity to Officers Monson and McDaniel, and remand for a grant of qualified immunity to those officers.

**Case No. 05-4038**

This appeal is brought by the Walker family members, who challenge the grant of summary judgment on qualified immunity to Officers Monson and McDaniel, and the grant of summary judgment to Utah County on their wrongful detention claim. For the reasons we have previously stated, we vacate for lack of jurisdiction the district court's determination for summary judgment purposes that the officers were entitled to qualified immunity.

We turn to plaintiffs' appeal of the district court's order granting summary judgment to Utah County. Utah County, as a municipal defendant, was not entitled to qualified immunity. *See, e.g., Valdez v. City & County of Denver*, 878 F.2d 1285, 1287 n.2 (10th Cir. 1989). Nor did the officers' qualified immunity appeals divest the district court from determining whether the Sheriff's Office was entitled to summary judgment. The appeals only divested the district court of jurisdiction over claims against the individual officers. *Stewart*, 915 F.2d at 576 (stating that interlocutory appeal "divests the district court of jurisdiction to proceed with any part of the action *against an appealing defendant*.") (emphasis added). Finally, in assessing the grant of summary judgment, we are not limited to the language of plaintiffs' complaint but must consider additional facts developed for purposes of summary judgment.

The district court concluded that plaintiffs had "failed to meet their burden of establishing the elements of [a] municipal liability [claim]" against Utah County. Aplt. App., No. 05-4038, Vol. II, at 779. It rejected plaintiffs' "failure to train" claim, reasoning that plaintiffs had "failed to establish any facts which show that either Deputies Monson or McDaniel were inadequately trained by Utah County, that Utah County acted with deliberate indifference towards the rights of citizens by not adequately training its officers, or even that a constitutional violation occurred as a result of their detention." *Id.* at 781. The district court also rejected plaintiffs' claim that Utah County had maintained a pattern or practice of permitting unconstitutional conduct by its officers, finding that "it was reasonable for the entities to conclude that their officers perceived a real threat to their own safety and acted out of self defense and that their conduct [was] reasonable." *Id.* (It is unclear whether the district court meant to refer to the detention claim when it justified the officers' actions on the basis of self-defense.)

"[A] plaintiff suing a county under section 1983 for the actions of one of its officers must demonstrate two elements: (1) a municipal employee committed a constitutional violation, and (2) a municipal policy or custom was the moving force behind the constitutional deprivation." *Myers v. Okla. County Bd. of County Comm'rs*, 151 F.3d 1313, 1318 (10th Cir. 1998). We now turn to plaintiffs' showing as to each of these elements.

-28-

## 1. Existence of a constitutional violation

The summary judgment evidence fleshed out considerably the bare bones of plaintiffs' unconstitutional detention claim, as described in their complaint. We have carefully reviewed these additional facts. While most of the additional facts developed merely confirm our previous analysis concerning the constitutionality of the officers' conduct, several facts require specific analysis and will be separately described here.

To begin with, the summary judgment evidence revealed that Monson and McDaniel's participation in the detention of plaintiffs did not last the full hour and a half alleged in plaintiffs' complaint. Officer Monson's involvement, for example, lasted only twenty-nine minutes, from approximately 7:16 p.m. when he arrived on the scene, until 7:45 p.m. when plaintiffs left for the hospital. Officer McDaniel's involvement may have been somewhat longer, but certainly not for the entire hour and one half. Thus, the length of detention attributable to Utah County may be as little as approximately one-half hour, rather than the one and one-half hours as generally alleged in plaintiffs' complaint. We do not believe that this fact alone, however, should result in summary judgment for Utah County, for two reasons. First, even a detention lasting approximately a half hour may not have been reasonable under the standard detailed in *Brown*, 443 U.S. at 50-51. As witnesses to a crime, plaintiffs could be detained no longer than necessary to obtain the basic information from them that we have specified. On

the summary judgment record in this case, there appears to be a genuine factual dispute concerning whether plaintiffs volunteered this basic information, or refused to provide it, when requested to do so by officers. Moreover, issues of fact remain concerning the amount of time reasonably necessary to secure the scene and insure the safety of the officers and witnesses present.

Second, even if a half-hour detention was reasonable, a ninety-minute detention would not have been. A difficult issue is thus posed concerning whether the detention in the range of one half hour directly attributable to Utah County should be viewed in a vacuum. As the district court recognized, *see* Aplt. App., No. 05-4038, Vol. II, at 716, if we examine *only* the length of the detention directly attributable to Utah County, this makes possible a "tag-team" approach, where officers from a variety of jurisdictions could take turns detaining citizens for constitutionally-permissible time periods that in the aggregate would amount to an unreasonable and excessively prolonged detention. To say that police are unlikely to adopt such an approach is to ignore plaintiffs' contention that they *did* behave in that fashion in this case. We conclude that even considering the additional facts developed on summary judgment, plaintiffs have established evidence of a constitutional violation for purposes of surviving summary judgment on their claim against Utah County.

## 2. Municipal policy or custom

Plaintiffs contend that Utah County's failure to correctly train its officers concerning the constitutional limitations on detention of witnesses in connection with police shooting investigations satisfies the second element of the test for municipal liability. "[I]n order for liability to attach to a municipality, the failure to train must amount to deliberate indifference to the rights of persons with whom the police come into contact." *Myers*, 151 F.3d at 1318 (quotation omitted). Plaintiffs argue that the training Officers Monson and McDaniel received satisfies this standard because they were trained that there was no limit on the amount of time they could detain witnesses.

The summary judgment record includes training materials Officer Monson received at a seminar in Ogden. A checklist for officer-involved shootings required officers on the scene to "[l]ocate, identify, detain, 'statementize' [sic] and sequester witnesses as well as possible." Aplt. App., No. 05-4038, Vol. II, at 630. The training materials further explained this requirement, stating that the officers should make "[p]rompt, *aggressive* and *thorough* attempts . . . to locate witnesses, then obtain meaningful statements [from them]," *id.* at 631 (emphasis added), should "[p]in them down as if that will be the only interview," *id.* at 632, and should, "[i]f possible, detain and sequester witnesses who have significant information for interviews with investigators after they give statements to patrol officers." *Id.*

-31-

The materials do not specify a particular time limit for the detention of witnesses. Officer Monson did explain his understanding that the length of detention is governed by a reasonableness standard. He stated "[t]here's no set time that I've ever been told. There's nothing written that a witness can only be held this long and then the clock is up . . . . I think it is a reasonableness standard, depending on the totality of the situation." *Id.*, Vol. I, at 275 (dep. p. 94). Plaintiffs point us to no evidence in the summary judgment record that suggests that Utah County either had a policy that officers could retain witnesses in situations involving a police shooting beyond the time reasonably necessary to investigate the incident, obtain necessary statements, secure the scene, and the like. Nor is there any evidence that Utah County's training suggested or permitted a policy that detention for an unreasonable time was allowed. Thus, summary judgment for Utah County must be affirmed.

Plaintiffs also argue that Utah County is liable because Officer Monson was the final policymaker for the county in terms of how the investigation was conducted. Having reviewed the evidence cited by plaintiffs, we agree with the district court that they have failed to establish Officer Monson's role as a policymaker for Utah County. *See Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995) (setting out standards for determining who is policymaker for municipal liability purposes).

**Cases No. 05-4016 and 05-4025**

These two appeals challenge the district court's denial of summary judgment based on qualified immunity to the officers who shot and killed David Walker. Case No. 05-4016 is brought by Sergeant Harold Peterson of the Orem City Police Department. Case No. 05-4025 is brought by Officer John Clayton of the Pleasant Grove Police Department. In each case, a threshold issue is presented: whether this court has jurisdiction over the interlocutory appeal from the denial of summary judgment.

This court has appellate jurisdiction over "final decisions" of the district courts. 28 U.S.C. § 1291. Under the "collateral order" doctrine, some district court orders are considered "final" even though they are entered before final judgment has entered in the case. *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546-47 (1949). One such collateral order permitting interlocutory appeal is an order denying qualified immunity. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). A denial of qualified immunity is only immediately appealable, however, to the extent the district court's decision turns on an abstract issue of law. *Id.*; *see also Johnson v. Jones*, 515 U.S. 304, 313-14, 317 (1995).

Included within these abstract issues of law reviewable on interlocutory appeal is the purely legal question of whether the facts alleged by plaintiff support a claim of violation of clearly established law. *Mitchell*, 472 U.S. at 528 n. 9. A defendant may not immediately appeal a district court's order denying

-33-

qualified immunity, however, merely to dispute the district court's conclusions that plaintiff's claims are supported by sufficient evidence in the record or that disputed issues of material fact exist which preclude summary judgment. *Johnson*, 515 U.S. at 313; *Foote v. Spiegel*, 118 F.3d 1416, 1422 (10th Cir. 1997).

The district court denied qualified immunity because it determined "that there are material issues of genuine fact, which, when viewed in the light most favorable to Plaintiffs, preclude this Court from determining as a matter of law that these Defendants' conduct was objectively reasonable in light of clearly established law." Aplt. App., No. 05-4016, Vol. III, at 671.[9] As we read it, the

---

[9] The district court identified seven categories of disputed and material facts:

I. That which was known, believed, or observed by Clayton and Petersen prior to their arrival at the Walker[s'] residence;

ii. Whether or not David Walker ever turned on Officer Peters[o]n prior to being shot by Officer Peters[o]n;

iii. Whether David Walker was confronting Officer Peterson at the time he was shot by Officer Peterson;

iv. Whether David Walker's arms were dropping at the moment he was shot by Officer Peters[o]n;

v. The amount of light that was available at the scene;

vi. What witnesses at the scene may have said prior to the shooting; and

vii. Whether Officers Clayton and Peterson gave any warnings prior to the shooting.

(continued...)

-34-

district court's ruling has two distinct components: (1) based on the evidence before it, there is a genuine issue of fact as to what happened during the encounter between the officers and Walker; and (2) viewing the disputed evidence in the light most favorable to plaintiff, the officers' conduct violated clearly established law.  We lack jurisdiction to review the district court's determination on the first point, that "the evidence could support a finding that particular conduct occurred." *Malik v. Arapahoe County Dep't of Soc. Servs.*, 191 F.3d 1306, 1314 (10th Cir. 1999) (quotation omitted).  At times, defendants appear to challenge the district court's finding concerning evidentiary sufficiency.  Officer Clayton, for example argues that "the seven 'disputes' identified by the district court were not actually disputes regarding Officer Clayton's version of events." Aplt. Opening Br., No. 05-4025, at 41.  Officer Peterson argues that "[c]ontrary to the district court's conclusion, the allegedly disputed facts are either unsupported by any evidence or are immaterial to the qualified immunity determination."  Aplt. Opening Br., No. 05-4016, at 10.  We lack jurisdiction over these challenges to the district court's findings to the extent they challenge the existence of disputed facts for summary judgment purposes.

---

[9](...continued)
Aplt. App., No. 05-4016, Vol. III, at 671-72.

We may, however, examine the facts presented on summary judgment in the light most favorable to the plaintiff,[10] to determine whether they amount to a violation of a clearly-established right. We have previously stated the standard for granting qualified immunity. In arriving at plaintiff's "version of the facts" for purposes of this inquiry, we begin by noting that plaintiff did not dispute most of the facts contained in the "statements of uncontroverted fact" accompanying defendants' motions for summary judgment. To the extent that these facts are undisputed, they must be deemed conceded for purposes of our inquiry. *Cf. Medina v. Cram*, 252 F.3d 1124, 1131 (10th Cir. 2001) (stating reviewing court need not look solely to plaintiff's version of facts where facts are undisputed). Plaintiff filed her own statement of additional undisputed facts, however, which the district court did not exclude. These facts must also be taken into account for purposes of the inquiry.[11]

We specifically reject Officer Clayton's argument that his undisputed statement of facts constitutes the only evidence to be considered for purposes of the qualified immunity inquiry. *See* Aplt. Mem. Br., No. 05-4025, at 12-15. He

---

[10] As the district court recognized, the only plaintiff with standing to bring the excessive force claim under § 1983 at issue here is Debbie Walker, in her capacity as the personal representative of David Walker's estate.

[11] Although plaintiffs filed a consolidated summary judgment memorandum, responding to all of the motions for summary judgment, Officers Peterson and Clayton each filed separate motions for summary judgment, containing separate factual materials. The district court did not distinguish between these materials in ruling on both summary judgment motions, and neither will we.

contends that since the plaintiff did not contest his statement of facts, and did not file a cross-motion for summary judgment, she could not present any additional facts by way of her own statement of uncontested facts. He relies upon a local rule, D. Utah Civ. R. 56-1(c), which states:

> **(c) Contested Facts Declared in Summary Judgment Motion.** A memorandum in opposition to a motion for summary judgment must begin with a section that contains a concise statement of material facts as to which the party contends a genuine issue exists. Each fact in dispute must be numbered, must refer with particularity to those portions of the record on which the opposing party relies and, if applicable, must state the number of the movant's fact that is disputed. All material facts of record meeting the requirements of Fed.R.Civ.P. 56 that are set forth with particularity in the statement of the movant will be deemed admitted for the purpose of summary judgment, unless specifically controverted by the statement of the opposing party identifying material facts of record meeting the requirements of Fed.R.Civ.P. 56.

It is true that plaintiff did not dispute most of the facts contained in Officer Clayton's statement of uncontroverted facts. Instead, she prepared a statement of *additional* facts which she contended were undisputed. While that is not exactly the format contemplated by the local rule,[12] the district court (which is the first line of enforcement for local rules) did not exclude plaintiff's additional facts presented in this format, even though urged to do so by Officer Clayton. Accordingly, neither will we.

---

[12]     Plaintiff could have, for example, complied with the rule by disputing the specific facts stated by defendants as "incomplete."

Because the district court did not identify with any specificity the facts that it assumed in denying summary judgment, *see Blossom v. Yarbrough*, 429 F.3d 963, 966 (10th Cir. 2005), we have carefully reviewed the materials presented to the district court to determine which facts it must have assumed, *Sevier v. City of Lawrence*, 60 F.3d 695, 700 (10th Cir. 1995). Plaintiff's version of the facts, viewed in light of this record and including defendants' facts undisputed by plaintiff, presents the following factual scenario.

## FACTS

Prior to the shooting, David Walker had been living with his parents and his sister in rural Utah County. David was unemployed, had not completed high school, had a criminal record involving drug possession, and was addicted to methamphetamine.

Two days before he was shot, David left the family home. He was depressed because his ex-wife had not allowed him to see his children at Christmas. When he left, he took an old Subaru that belonged to his sister, Patti. The automobile was neither registered nor insured, and David did not possess a driver's license.

David's mother called him after the family realized the car was missing. During their conversation, David threatened to kill himself. Concerned with this threat, his family decided to contact the police. They reported the Subaru stolen in order to obtain assistance in locating David.

-38-

The next day, December 29, David called his mother. The Orem police were able to trace the call to a Sinclair station. David saw the police arrive at the gas station and was able to evade them. The Orem police pursued David throughout Orem as he drove dangerously on busy streets. After he ran a red light, the Orem police called off the chase but kept the Subaru in sight. The Subaru crisscrossed the foothills above Orem, Lindon, and Pleasant Grove.

Officer Peterson was working an accident when he heard an Orem dispatch for a suspect at a Sinclair station who was possibly en route to cause harm to his family. None of David's family members, however, had stated they believed David would harm them; this report was apparently an error by the Orem dispatcher. Shortly thereafter, the Orem dispatcher added information that David was threatening suicide. This additional information was broadcast before Officer Peterson became involved in the chase.

Sometime after he heard the Orem dispatch, the Pleasant Grove police department radioed Officer Peterson, asking him to bring spikes (a tool used to shred tires) to help end the pursuit of the Subaru. Officer Peterson left the auto accident scene to take the spikes to Pleasant Grove.

In the meantime, as David Walker drove down out of the foothills, police sergeant Krisden Hendricksen spotted David's car near the Kiwanis Park area of Pleasant Grove. He pulled his police car behind the Subaru at a stop sign in an attempt to box it in. Officer Peterson, who was also in the vicinity, activated his

-39-

overhead lights, and assisted with the attempt to box the Subaru in. Sergeant Hendricksen then approached Walker, night stick in hand, yelling, "Police. Stop." Walker backed up the Subaru, forcing Hendricksen to jump out of the way, and evaded the officers by driving through a ditch and bouncing back up onto the street.

Officer Peterson thereafter chased the Subaru through Pleasant Grove at speeds ranging from 30 to 50 miles per hour, as David Walker ran through a series of stop signs. Officer Clayton joined the pursuit after he received a dispatch call stating that the pursuit was nearing his location.

The chase ended in the driveway in front of the Walker family residence. Plaintiff asserts that the officers at least should have known, based on radio broadcasts, that this was the Walker residence. The officers, however, deny knowing where they were.

Although it was night time, there were several sources of light on the scene: the porch light, a large building light, the Subaru's two headlights on high

beam,[13] the two officers' cars' lights, and the moon.[14] One witness described the scene as bright enough to read a book.

David stopped the Subaru in the driveway. Officer Peterson pulled his car in behind the Subaru. Officer Clayton arrived shortly after Peterson and parked his car behind Peterson's marked car. The officers turned off their sirens after they arrived on the scene.[15]

David got out of his car and moved away at something between a walk and a jog. Things happened very fast after this. One witness estimated that he was shot only about twelve seconds later. Officer Peterson turned off his spotlight, got out of his car, and moved up the driver's side of the Subaru.[16] He had drawn his gun before leaving the car.

---

[13]  Defendants contend that the left headlight on the Subaru was broken; plaintiff disputes this. The videotaped crime scene walkthrough does show significant damage to the Subaru's left front quarter panel, and it is evident that the left headlight was not working at the time of the walkthrough. It is unclear whether the damage was sufficient to have rendered the headlight inoperable on its high beam setting at the time of the shooting.

[14]  Defendants assert that heavy clouds obscured any ambient light that might have come from the moon, or from starlight.

[15]  Defendants contend that the sirens remained on after the end of the chase. In the district court, they apparently supplied a tape recording of Officer Peterson's call to dispatch after the shooting on which they asserted that police sirens could be heard. We do not have this recording as part of the record on appeal, however.

[16]  Officer Peterson asserted that he sought to end the pursuit by tackling David Walker from behind. Plaintiff contends that he was never close enough to David to tackle him.

-41-

David then pulled a knife or box-cutter out of his pocket, and held it to his wrist.[17] His hands were about chest height, straight out. His left wrist was bent to expose the wrist. He was facing at an angle somewhat but not directly facing toward Officer Peterson, who was behind the Subaru's driver's side door, approximately twenty-one feet away.[18]

Tyree Lamph, who witnessed the shooting, thought for a split second that the box-cutter might be a gun. Debbie Walker and Patti Walker Stratton, however, realized immediately that it was a knife. They began shouting to Officer Peterson that David did not have a gun. Officer Peterson contends that he shouted commands to David such as stop, freeze, and drop his weapon. Ms. Walker and Ms. Stratton testified, however, that they did not hear Peterson issue any such commands.

Officer Peterson testified that he believed that David had a gun. Specifically, he thought it was a .38 special with a two-inch barrel. He backpedaled and pulled the trigger on his gun twice, attempting to shoot David. Officer Peterson's gun did not fire. This was because he had grabbed the gun so

---

[17]     The object David held to his wrist was described by various witnesses as a box cutter, Aplt. App., No. 05-4025, Vol. I, at 128, a razor knife used as a box cutter, *id.* at 131, a "hinged razor," *id.* at 101, and a knife, *id.* at 135. Any discrepancy in the description is not material to the outcome of this case.

[18]     Plaintiff contended in her statement of undisputed facts that David's body was facing Tyree and angled away from Officer Peterson. She did not dispute Officer Clayton's undisputed statement of fact, however, that David was facing toward Peterson at some point prior to the time Peterson fired.

fast that his thumb had hit the clip release. David started to lower his hands, as though he were going to take off running from the officers. Before he could take any further action, however, Officer Peterson popped the clip back in and opened fire.

Officer Peterson shot David in the right hip. The bullet penetrated his right hip, traversing his body, and lodged in his left hip. David staggered back four or five steps, hit the back of a parked camper, and fell forward.

Officer Clayton was kneeling behind his car, fifty-eight feet away. He had heard shots fired, but had not seen a muzzle flash, and did not see anything that looked like a gun in David's hands. He relied solely on David's actions to conclude that he was in danger. Specifically, after David was shot by Officer Peterson, David swung toward Officer Clayton in what Officer Clayton described as a "classic pistol shooting stance."[19] Also, Officer Peterson had sunk down behind the Subaru, taking cover, and Officer Clayton believed he might have been shot.

---

[19] Plaintiff now argues that this description of David's position is inconsistent with the ballistic evidence. Aplee Br., No. 05-4025, at 17. In the district court, however, she did not dispute Officer Clayton's statement of undisputed material fact no. 20, in which Officer Clayton cited his deposition testimony that David turned in his direction with his arms outstretched in a classic pistol shooting stance.

Officer Clayton opened fire, hitting David in the chest with two shots.[20]  It is plaintiff's theory that Officer Peterson then fired a final shot that ricocheted off the ground, struck David's back, and lodged in a mud flap on the ground beside David.  Four expended shell casings were found on the ground at the scene.  After the shooting, the officers discovered that David had only the knife, and not a gun.

## ANALYSIS

Having set out these applicable facts, we must next determine, on de novo review, whether they amount to a violation of a clearly established constitutional right.  Officer Clayton contends that in conducting this inquiry, the district court erred by failing to separate his own liability from that of Officer Peterson.  We will consider the officers' conduct separately for purposes of this de novo inquiry.

We analyze claims of excessive force under the Fourth Amendment's objective reasonableness standard.  *Medina*, 252 F.3d at 1131.  It is clearly established that an officer must use only reasonable force to effectuate a seizure.  *Id.*  "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment

---

[20]     Officer Peterson contends that only one of the two bullets Officer Clayton fired entered David's chest.  The other, he argues, entered David's back after he had been spun around.  The parties submitted complex forensic testimony on these issues; however, for purposes of our inquiry, we must accept plaintiff's version of events.

interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quotations omitted). Moreover, "[t]he reasonableness of an officer's conduct must be assessed from the perspective of a reasonable officer on the scene . . . [who] may be forced to make split-second judgments under stressful and dangerous conditions." *Medina*, 252 F.3d at 1131 (quotations omitted).

In conducting this inquiry, we consider the totality of the circumstances, including such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The use of deadly force is justified under the Fourth Amendment if a reasonable officer in the Defendant's position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." *Phillips v. James*, 422 F.3d 1075, 1083 (10th Cir. 2005) (quotation omitted).

**Officer Peterson**

According to plaintiff's version of events, Officer Peterson shot David Walker twice from a distance of at least twenty-one feet. Officer Peterson drew his gun before he left his patrol car. David Walker did not have a gun and was not pointing a gun at Officer Peterson. He did have a small knife or box cutter,

which he was in the process of lowering at the time Officer Peterson fired. He was not advancing on Officer Peterson.

Information was broadcast over the police radio before Officer Peterson arrived at the location of the shooting that David was suicidal, not homicidal. While David had previously eluded police, nearly running over an officer, and had driven recklessly just prior to the incident, he had not affirmatively led anyone to believe that he had a firearm and had not made any violent threats toward the officers or others.

Just before the shooting, David Walker's body was angled roughly toward Officer Peterson. As plaintiff points out, David could not have been squarely facing Officer Peterson, because the first bullet entered his right hip, traversed his body, and lodged in his left hip. David was holding the knife to his left wrist. His left wrist was bent downward to expose it to the knife blade. While it was night time, plaintiff asserts that there were a number of light sources on the scene that would have made it possible for Officer Peterson to see fairly well. (He admits he could see well enough to determine the specific caliber of the pistol he thought David was pointing at him.)

Witnesses on the scene were yelling to Officer Peterson that David Walker did not have a gun. He claims he did not hear them. They, in turn, claim they never heard Officer Peterson yell to David Walker to drop the weapon, or give him any other commands. There would not have been much time for commands

-46-

in any event. Less than twelve seconds after David Walker exited his vehicle, Officer Peterson opened fire on him.

We conclude that plaintiff's version of the facts presented on summary judgment support a claim of a violation of David Walker's Fourth Amendment right to be free from excessive force. Plaintiff's version of events suggests that Officer Peterson acted precipitously in shooting David, who posed a danger only to himself. The crimes at issue (theft of the vehicle, eluding the officers) were not particularly severe. David did not pose an immediate threat to the safety of the officers or others. He had made no threats and was not advancing on anyone with the small knife. He was holding the knife to his own wrist. While Officer Peterson stated that he believed David was pointing a gun at him, this belief was not reasonable, if plaintiff's version of events is accepted, and she is given the benefit of every reasonable inference. The angle of David's hands and the amount of light on the scene should have permitted Officer Peterson to ascertain that he was not holding a gun in a shooting stance. Finally, David was not actively resisting arrest, and there was no need to use deadly force to prevent him from fleeing and possibly harming others.

The right to be free from excessive force was well established in this circuit at the time of the events in question. *See, e.g., Allen v. Muskogee*, 119 F.3d 837, 840-41 (10th Cir. 1997). It was specifically established that where an officer had reason to believe that a suspect was only holding a knife, not a gun, and the

suspect was not charging the officer and had made no slicing or stabbing motions toward him, that it was unreasonable for the officer to use deadly force against the suspect. *Zuchel v. City & County of Denver*, 997 F.2d 730, 735-36 (10th Cir. 1993). Plaintiff's version of the facts therefore shows the violation of a clearly-established constitutional right. We must therefore affirm the district court's order denying qualified immunity to Officer Peterson.

**Officer Clayton**

Much of what has already been said about the circumstances surrounding Officer Peterson's actions also applies to Officer Clayton's conduct. At the time he fired at David, Officer Clayton was behind the cover of his vehicle, fifty-eight feet away from David. David was not advancing on him and had not threatened him in any way, other than allegedly pointing his hands in Officer Clayton's direction in what Officer Clayton interpreted as a "classic shooting stance." Officer Clayton had not seen a gun in David's hands. Whether he reasonably believed from the shots he heard, and the fact that Officer Peterson had ducked behind the Subaru, and the position of David's body and hands, that he or others were in danger from David, is a factual question that remains to be resolved. When reviewing the denial of a motion for summary judgment based on qualified immunity, we are not only required to accept plaintiff's version of events; we are also required to draw all reasonable inferences in favor of the non-moving party. *Verdecia v. Adams*, 327 F.3d 1171, 1174 (10th Cir. 2003). We conclude that,

given all reasonable inferences, plaintiff's version of the facts shows the violation of a constitutional right. That right is also clearly established. We must therefore affirm the district court's denial of qualified immunity to Officer Clayton.

## CONCLUSION

In Case No. 04-4140, we reverse the district court's denial of qualified immunity to Officers Monson and McDaniel, and remand for a grant of qualified immunity to those officers. In Case No. 05-4038, we vacate the district court's grant of summary judgment to officers Monson and McDaniel, but affirm the grant of summary judgment in favor of Utah County. We dismiss Cases No. 05-4016 and 05-4025 in part for lack of appellate jurisdiction, and affirm in part.