**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 6, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

RUSSELL TENORIO,

      Plaintiff - Appellee,

v.

BRIAN PITZER,

      Defendant – Appellant,
and

RAYMOND D. SCHULTZ, THE CITY
OF ALBUQUERQUE; ROBERT
LICCIONE; ANDREA ORTIZ,

      Defendants.

No. 14-2114

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. 1:12-CV-01295-MCA-KBM)**

---

Stephanie M. Griffin, Assistant City Attorney, Albuquerque, New Mexico, for Defendant
- Appellant.

Katherine Wray (Rachel E. Higgins and Kari T. Morrissey, with her on the brief),
Albuquerque, New Mexico, for Plaintiff - Appellee.

---

Before **TYMKOVICH**, Chief Judge, **HARTZ**, and **PHILLIPS**, Circuit Judges.

**HARTZ,** Circuit Judge.

Albuquerque Police Officer Brian Pitzer shot Russell Tenorio when responding to an emergency call. Tenorio sued Pitzer in the United States District Court for the District of New Mexico under 42 U.S.C. § 1983, asserting that Pitzer violated his Fourth Amendment rights by using excessive force. The district court denied Pitzer's motion for summary judgment, concluding that there was evidence that Pitzer violated clearly established law under two theories: (1) when Pitzer shot Tenorio he "did not have probable cause to believe that [Tenorio] presented a threat of serious physical harm to [Pitzer] or another person," Aplt. App. at 208, and (2) Pitzer and his fellow officers recklessly created the situation that resulted in the use of deadly force. Pitzer appeals. We have jurisdiction under 28 U.S.C. § 1291 and affirm the denial of summary judgment because the evidence would support a violation of clearly established law under the first theory. We therefore need not address the second theory,[1] and remand for further proceedings.

## I. BACKGROUND

---

[1] *See Aldaba v. Pickens*, 777 F.3d 1148, 1159 n.2 (10th Cir. 2015) (On review of denial of motion for summary judgment based on qualified immunity, once appellate court determined that initial use of force was excessive, it was unnecessary to determine on appeal "whether the officers' subsequent actions would likewise constitute excessive force.").

Although the district court denied summary judgment and has not entered a final judgment, "we have interlocutory jurisdiction over denials of qualified immunity at the summary judgment stage to the extent that they turn on an issue of law." *Romero v. Story*, 672 F.3d 880, 882 (10th Cir. 2012) (brackets and internal quotation marks omitted). We reduce the question before us to one of law by accepting the district court's assessment of the facts, which was based on the parties' agreement on undisputed facts and the court's construing the remaining evidence in the light most favorable to Tenorio. *See id.* at 882–83. Indeed, on an interlocutory appeal from the denial of a summary-judgment motion based on qualified immunity, we are almost always barred from reviewing whether the district court erred in determining that an alleged fact was supported by sufficient evidence. *See id.* at 883; *Lewis v. Tripp*, 604 F.3d 1221, 1225−26 (10th Cir. 2010) (noting the exceptions).

The district court's opinion set forth the following facts: On November 11, 2010, at 7:56 p.m., a 911 operator received a call from Hilda Valdez, who told the operator, "I need someone to come over here right away." Aplt. App. at 204 (internal quotation marks omitted). Ms. Valdez reported that her sister-in-law's husband, later identified as Tenorio, was intoxicated and holding a knife to his own throat. She said that she was afraid that Tenorio would hurt himself or his wife Michaele. Officers Moore, Hernandez, and Liccione were dispatched in response to the call, and Pitzer also responded. The 911 operator relayed some of the information provided by

3

Ms. Valdez to the Albuquerque Police Department dispatcher, who relayed the

following information to the officers:

> Male [subject] Russell is [drunk] and [on scene]
> [Subject] has a knife to his own throat . . .
> [No injuries] at this time
> Male has [vandalized] windows in the [location] . . .
> Male has been violent in the past . . .
> Male takes meds for seizures . . .
> Male, [caller] and males wife Michelle are all [on scene] inside the [location]
> [Caller's] brother Bob Torres is also [on scene] . . .
> Offender is in the kitchen [with] the knife
> [Caller] is in the living room
> Male is still holding the knife in his hand
> Male is waving knife around . . .
> [Caller's] sister and [caller] are in the living room
> Offender and [caller's] brother are in the kitchen
> [Caller] is standing outside the [location] waiting for [officers] . . .

*Id.* at 73–74 (capitalization omitted) (items in brackets are spelled-out abbreviations

or translations of police codes).

The officers, all in uniform, arrived on the scene in separate vehicles within

eight minutes of the original call. They parked their vehicles a short distance from the

residence. About a minute later they approached Ms. Valdez, who was standing

outside the house still speaking to the 911 operator. She appeared frightened. Pitzer

had not received crisis-intervention training, but Moore and Liccione had. Moore told

Ms. Valdez to end her 911 call. She told the officers: "He's got a knife. He's been

drinking . . . . He's like thirty-seven, thirty-eight years old. Um, we tried to talk to

him but he got mad 'cause we took his beer away from him." *Id.* at 205 (internal

quotation marks omitted). Pitzer announced that he was "going lethal." *Id.* (internal

4

quotation marks omitted).  Without asking if there was a hostage or settling on a

tactical plan, the officers lined up outside the front door to the residence.  Pitzer was

in the front with his handgun drawn.  Moore was behind him, carrying a Taser, and

Liccione was third, with his handgun drawn.  Hernandez was behind the other

officers, carrying a shotgun loaded with beanbag rounds, but was temporarily

occupied in preventing Ms. Valdez from reentering the residence.

The front door was open.  The living room's dimensions were about 14 feet by

16 feet, with the front door on one of the shorter walls.  A lamp was on in the room.

From his position outside the front door, Pitzer could see two doorways on the

opposite wall.  The one to his right, which led to the kitchen, was directly across from

the front door.  Part of the kitchen was obscured by the living-room wall.  The officers

did not hear raised voices or other sounds suggesting a disturbance.  Without

announcing his presence, Pitzer entered the living room, followed by Moore and

Liccione.  Mrs. Tenorio moved into the area of the kitchen visible through the right

doorway.  Pitzer first said, "Ma'am," and then, "Please step out here.  Let me see your

hands, okay?"  *Id.* at 206 (internal quotation marks omitted).  At least one of the other

officers understood "Please step out here" to be addressed to everyone in the kitchen.

As Mrs. Tenorio moved out of the kitchen, she said, "Russell, put that down."

*Id*.  She walked into the living room with her hands up and palms facing the officers.

She was followed by Tenorio, who had a blank stare and was carrying a santoku-style

kitchen knife with a three-and-a-quarter-inch blade.  He was holding the knife loosely

5

in his right hand, his arm hanging by his side, as he walked behind his wife. He was followed by a second man. Hernandez grabbed Mrs. Tenorio and took her outside. Tenorio walked forward into the living room at an "average speed." *Id.* at 207 (internal quotation marks omitted). Pitzer saw the knife and yelled, "Sir, put the knife down! Put the knife down, please! Put the knife down! Put the knife down!" *Id.* (internal quotation marks omitted). When Tenorio was about two and one-half steps into the living room, Pitzer shot him, Moore tased him, and he fell to the floor. The commands and the shooting lasted two or three seconds. The time between the first officer's arrival and the shooting was less than four minutes. Tenorio was hospitalized for two months as a result of his life-threatening injuries.

The district court analyzed Tenorio's first theory of liability—that Pitzer shot him when Pitzer lacked probable cause to believe that Tenorio posed a threat of serious harm to anyone—under the four (nonexclusive) factors set forth in *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008): "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." The court concluded that a jury could find the first factor to be neutral because even though Pitzer ordered Tenorio to drop his knife, "[a] reasonable jury could find that Defendant did not 'refuse' to drop the knife because he was not given sufficient time to comply." Mem. Op. & Order at 7, *Tenorio v. Pitzer*,

6

Civ. No. 12-01295 MCA/KBM consolidated with Civ. No. 13-00574 MCA/KBM (D.N.M. May 28, 2014). It said that a jury could find that the second factor weighed against probable cause because it could find that Tenorio "was holding a small kitchen knife loosely by his thigh and that he made no threatening gestures toward anyone." *Id.* On the third factor, the court said that a jury could find that it weighed against probable cause because the jury could find that Tenorio, although walking toward Pitzer, was shot "before he was within striking distance of [Pitzer]." *Id.* at 8. And it said that a jury could also find that the fourth factor weighed against probable cause because the jury could reasonably find that the information provided to Pitzer "indicated that the only person that [Tenorio] was known to have threatened that night was himself, and that as [Tenorio] walked into the living room he did not raise the knife from his side or make threatening gestures or comments toward anyone." *Id.*

## II.    DISCUSSION

### A.    Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). In the Fourth Amendment context, "[t]his inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Id.* at 822 (internal quotation marks omitted). "Ordinarily, in order for the law to

7

be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Becker v. Bateman*, 709 F.3d 1019, 1023 (10th Cir. 2013) (internal quotation marks omitted). We do not engage in "a scavenger hunt for prior cases with precisely the same facts" but examine "whether the law put officials on fair notice that the described conduct was unconstitutional." *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010) (internal quotation marks omitted).

The plaintiff bears the burden of establishing both (1) that the defendant violated a constitutional right and (2) that the right had been clearly established by the time of the violation. *See Becker*, 709 F.3d at 1022. When, as here, the facts are not disputed (at least for the purposes of appeal), our review is de novo. *See Aldaba*, 777 F.3d at 1154.

## B.     Excessive-Force Claims

We review Fourth Amendment claims of excessive force under a standard of objective reasonableness, judged from the perspective of a reasonable officer on the scene. *See Graham v. Connor*, 490 U.S. 386, 396–97 (1989). "The reasonableness of [an officer's] actions depends both on whether the officers were in danger at the precise moment that they used force and on whether [the officer's] own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995) (footnote omitted). But "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain,

8

and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

The Fourth Amendment permits an officer to use deadly force only if there is "probable cause to believe that there [is] a *threat of serious physical harm to [the officer] or to others.*" *Estate of Larsen*, 511 F.3d at 1260 (internal quotation marks omitted). "A reasonable officer need not await the glint of steel before taking self-protective action; by then, it is often too late to take safety precautions." *Id.* (ellipsis and internal quotation marks omitted). The four factors noted by the district court are quite significant. But they are only aids in making the ultimate determination, which is "whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." *Id.* The belief need not be correct—in retrospect the force may seem unnecessary—as long as it is reasonable. *See id.*

## C.    Application to Officer Pitzer

One could argue that Pitzer appropriately used lethal force. The officers were responding to an emergency call for police assistance to protect against danger from a man who had been violent in the past and was waving a knife around in his home. The man was walking toward Pitzer in a moderate-sized room while still carrying the knife despite repeated orders to drop it.

But the district court ruled that the record supports some potential jury findings that would establish Tenorio's claim—in particular, that Tenorio "did not 'refuse' to drop the knife because he was not given sufficient time to comply" with Pitzer's order; that

9

Tenorio made no hostile motions toward the officers but was merely "holding a small kitchen knife loosely by his thigh and . . . made no threatening gestures toward anyone."; that Tenorio was shot "before he was within striking distance of [Pitzer]; and that, for all Pitzer knew, Tenorio had threatened only himself and was not acting or speaking hostilely at the time of the shooting. Mem. Op. and Order, *supra*, at 7–8. As previously noted, we cannot second guess the district court's assessment of the evidence on this interlocutory appeal; and we are comfortable that the evidence, viewed in this light, suffices for Tenorio's claims.

In fact, our precedents compel this result. Our decision in *Zuchel v. City & County of Denver*, 997 F.2d 730, 735–37 (10th Cir. 1993), as construed in *Walker v. City of Orem*, 451 F.3d 1139, 1160 (10th Cir. 2006), sets forth the clearly established law that resolves this case.

In *Zuchel* we reviewed the sufficiency of the evidence to support a jury verdict that Officer Frederick Spinharney had used excessive force against the plaintiffs' decedent, Leonard Zuchel. We set forth the following evidence, excluding "other evidence more favorable to the [defendant]." *Zuchel*, 997 F.2d at 737. The manager of a restaurant had called the police to complain that Zuchel had been creating a disturbance at the restaurant. *See id.* at 735. By the time Spinharney and Officer Teri Hays arrived at the restaurant, Zuchel had departed. *See id.* They found him around the corner, where he was engaged in "a heated exchange" with four teenagers on bicycles. *Id.* One shouted to the officers that Zuchel had a knife. *See id.* According to one uninvolved observer, the

10

officers walked up behind Zuchel; Spinharney told him to shut up; Zuchel turned with his hands up in the air and took "three wobbly steps" toward Spinharney, who was six to eight feet away; and Spinharney shot him. *Id.* at 736. A second uninvolved observer gave essentially the same account, except that she said that Spinharney was about ten feet from Zuchel when he first shouted; that she heard Spinharney tell Zuchel to "drop it"; and that Zuchel's left hand was pointing over his shoulder to the teenagers as he turned around and his right hand was by his side. *Id.* (internal quotation marks omitted). She added that he "was not charging the officer and made no slicing or stabbing motions toward him." *Id.* Officer Hays testified that as she and Spinharney approached Zuchel from behind, she hollered "Hey" and "he turned around in a normal fashion." *Id.* (internal quotation marks omitted). Then one of the teenagers said, "Watch out: he's got a knife." *Id.* (internal quotation marks omitted). She said that when the officers were about 15 feet from him, Spinharney told Zuchel to "Drop it. Drop it." Zuchel then "walk[ed] forward at a slow pace." *Id.* (internal quotation marks omitted). She moved toward Zuchel; as she did so, she saw nothing in his right hand but could not clearly see his left. *See id.* When Spinharney fired, Zuchel was right next to her and less than five feet from Spinharney. *See id.* The coroner testified that Zuchel's right arm was directly across his chest when he was shot, indicating that it was not "extended in a threatening manner." *Id.* No knife was found. *See id.*

We held that the evidence was sufficient for the jury to find that the "use of deadly force was not objectively reasonable under the circumstances." *Id.* We did not parse the

11

evidence to say precisely what version the jury needed to believe to make that finding. It is possible, for example, that we thought it was necessary for the jury to disbelieve the testimony that Spinharney had told the plaintiff to drop his weapon. But the more natural reading of our opinion is that any discrepancies among the witnesses were irrelevant.

And that is how we construed *Zuchel* a few years later in *Walker*. We said that *Zuchel* "specifically established that where an officer had reason to believe that a suspect was only holding a knife, not a gun, and the suspect was not charging the officer and had made no slicing or stabbing motions toward him, that it was unreasonable for the officer to use deadly force against the suspect." 451 F.3d at 1160.

Given the facts that we must accept on this appeal, that standard applies to this case. Tenorio was not charging Pitzer. He had merely taken three steps toward the officer, as had Zuchel. Unspeaking and with a blank stare on his face, he made no aggressive move toward any of the officers with his knife. He was no closer to the officers than Zuchel had been. The district court said that the jury could find that he was not "within striking distance" when he was shot and was only "holding a small kitchen knife loosely by his thigh." Mem. Op. & Order, *supra*, at 7−8. Zuchel had also been ordered to "drop it." Unlike in *Zuchel*, Tenorio actually had a knife. But given the warning by the teenager, the officer in *Zuchel* could have reasonably believed that Zuchel had one; and, as determined by the district court here, the jury could have found that Tenorio did not have enough time to obey Pitzer's order. Finally, Tenorio's behavior before the officers arrived was not more aggressive than what had been reported to

Spinharney (it would have been reasonable for Spinharney to infer from the teenager's warning that Zuchel had brandished a knife during the heated exchange).

We recognize that we distinguished *Walker*'s statement of the law in our opinion in *Estate of Larsen*, 511 F.3d 1255. But the distinction we made in that case was that the victim had made "hostile actions toward" the officer. *Id.* at 1263. We said that "[t]he undisputed facts here show that [the victim] ignored at least four police commands to drop his weapon and then turned and stepped toward the officer with a large knife raised in a provocative motion." *Id.* In contrast, the evidence in this case would support a finding that Tenorio took no hostile or provocative action toward the officers.

We conclude that the district court, given its unreviewable assessment of the evidence, did not err in denying the qualified-immunity motion for summary judgment. We note, however, that because our review is predicated on the district court's assessment of the evidence in the li ght most favorable to Tenorio, a contrary judgment may be permissible after a trial to a jury.

## III. CONCLUSION

We AFFIRM the district court's denial of summary judgment.

13

No. 14-2114, *Tenorio v. Pitzer*

**PHILLIPS**, Circuit Judge, dissenting:

I would reverse the district court's denial of summary judgment for Officer Pitzer based upon qualified immunity. I see no violation of Russell Tenorio's constitutional rights, let alone one clearly established in our law.

A. *General Principles*

Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)). This "accommodation for reasonable error exists because 'officials should not err always on the side of caution' because they fear being sued." *Id.* (quoting *Davis v. Scherer*, 468 U.S. 183, 196 (1984)). Qualified immunity exists "to ensure that fear of liability will not 'unduly inhibit officials in the discharge of their duties.'" *Camreta v. Green*, 563 U.S. 692, 131 S. Ct. 2020, 2030 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)).

We evaluate Fourth Amendment excessive-force claims under an objective-reasonableness standard, measuring the challenged police conduct from a reasonable officer's perspective. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). As the majority notes, "[t]he reasonableness of [an officer's] actions depends both on whether the officers

were in danger at the precise moment that they used force and on whether [the officer's] own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." Maj. Op. at 8 (quoting *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995) (footnote omitted)). And as the majority also recognizes, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Maj. Op. at 8–9 (quoting *Graham*, 490 U.S. at 396–97).

B. *The Majority's Analysis*

As I read the majority opinion, it refuses qualified immunity to any law-enforcement officer who shoots a knife-wielding suspect unless that person "charges" the officer and aggressively motions toward the officer with the knife. *See* Maj. Op. at 10–12. The majority believes this result is compelled by this single sentence taken from *Walker v. City of Orem*, 451 F.3d 1139, 1160 (10th Cir. 2006):

> It was specifically established [in *Zuchel v. City & Cty. of Denver*, 997 F.2d 730, 735–36 (10th Cir. 1993) (*Zuchel II*)] that where an officer had reason to believe that a suspect was only holding a knife, not a gun, and the suspect was not charging the officer and had made no slicing or stabbing motions toward him, that it was unreasonable for the officer to use deadly force against the suspect.

I disagree with the majority that *Walker* so dramatically shrunk—or intended to shrink—our analytical framework applied in *Zuchel II* until now. Rather than narrowing a robust totality-of-circumstances inquiry to two meager factors, I believe *Walker* simply recognized the importance of those factors as part of evaluating qualified immunity. *See*

2

451 F.3d at 1159 (considering "the totality of the circumstances" under the Fourth Amendment objective-reasonableness standard). Although I certainly agree with the majority that these two facts were important ones considered in *Zuchel II*, I disagree that they rendered all other facts and factors meaningless. In assessing danger to self and others, a reasonable officer and a reviewing court must account for far more than what's highlighted in the single sentence quoted from *Walker*. To determine if conduct is objectively reasonable, we consider all circumstances, not just two circumstances. *See Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) ("We assess objective reasonableness based on whether the totality of the circumstances justified the use of force, and pay careful attention to the facts and circumstances of the particular case.") (citation omitted). Nothing in *Walker* deprives Officer Pitzer of summary judgment based on qualified immunity. To see why, we need look no further than our cases on point.

At the outset, it is important to recognize that this court has decided two *Zuchel* appeals, the first contesting the district court's denial of summary judgment on qualified-immunity grounds to the shooting officer, *Zuchel v. Spinharney*, 890 F.2d 273 (10th Cir. 1989) (*Zuchel I*), and the second contesting the sufficiency of the evidence after a $300,000 jury verdict against the city and county of Denver, *Zuchel II*, 997 F.2d at 730. Unfortunately, the majority ignores *Zuchel I*, where we affirmed the district court's denial of summary judgment to the shooting officer based on qualified immunity. We did so after acknowledging that the officer would easily be entitled to immunity if we considered only his evidence. 890 F.2d at 275. But because the record contained

sufficient evidence (if a trier of fact believed it) to support a finding that the officer's conduct was not objectively reasonable, we affirmed the district court's denial of summary judgment and remanded the case. *Id.* at 275–76; *see also King v. Hill*, __ F. App'x __, 2015 WL 3875551, at *5-6 (10th Cir. June 24, 2015) (unpublished) (affirming denial of summary judgment for qualified immunity to deputy in shooting after considering the facts in the light most favorable to the plaintiff and giving plaintiff all reasonable inferences). The plaintiffs then settled the claim against the shooting officer and went to trial on the claim against Denver. *Zuchel II*, 997 F.2d at 733. In evaluating the appropriateness of summary judgment on Officer Pitzer's claim of qualified immunity, we should focus on the reasons this court denied it to the shooting officer in *Zuchel I:*

> Other testimony and evidence contained in the summary judgment record casts doubt on the objective reasonableness of Spinharney's use of deadly force. At least one witness estimated Zuchel's distance from Spinharney to be 10–12 feet at the time the shots were fired. This same witness testified that Zuchel was neither charging Spinharney nor stabbing at him, but instead was shot after Zuchel stopped and was trying to "explain what was going on." Another witness indicated that Zuchel was clearly not close enough to stab Spinharney. Spinharney's partner, Officer Rathburn, testified that she could not see any weapon in Zuchel's hand. One witness claims to have heard Spinharney tell Zuchel to "shut up or you're going to die." Other witnesses heard no warning by the officers. At least one witness testified Spinharney fired the four shots "[a]s fast as he could pull the trigger."

890 F.2d at 275 (citations omitted). Importantly, we can see from this that more was involved in our denying Officer Spinharney summary judgment for qualified immunity than Zuchel's not charging him or making slashing or stabbing motions.

In *Zuchel II*, the plaintiffs (Zuchel's parents) proceeded to trial on a municipal-liability claim against Denver based on its deliberate indifference in inadequately training its officers. 997 F.2d at 733–35. To prevail, the plaintiffs needed to prove (among other things) that Officer Spinharney exceeded constitutional limitations in the use of deadly force. *Id.* at 734. Ultimately, a jury found in the plaintiffs' favor. *Id.* at 733. On appeal, Denver contended that insufficient evidence supported the verdict. *Id.* Accordingly, this court in *Zuchel II* considered a similar issue as in *Zuchel I*: whether plaintiffs had presented sufficient evidence, together with favorable inferences, to sustain the decision made in the district court (whether on summary judgment or jury verdict). We reviewed de novo the district court's denial of Denver's post-verdict motion, and in doing so acknowledged that "[w]e must view the evidence in the light most favorable to the party against whom the motion is made and give that party the benefit of all reasonable inferences from the evidence." *Id.* at 734 (citations omitted).

With this in mind, the court in *Zuchel II* reviewed the trial evidence. It recounted testimony from eyewitnesses, including those whose deposition testimony we relied on in affirming the district court's denial of summary judgment. *Id.* at 735–36. For instance, in *Zuchel I*, we noted that Jeffrey Purvis had testified in his deposition that Zuchel was clearly not close enough to stab Spinharney and that he heard Spinharney tell Zuchel to "shut up, or you're going to die." 890 F.2d at 275. At trial, Purvis testified consistently. *Zuchel II*, 997 F.2d at 735–36. In *Zuchel I*, we also relied on deposition testimony of Deborah Seme, who had estimated the distance between the two men at shooting at about 10 to 12 feet, said that Zuchel was trying to "explain what was going on," and said that

5

Officer Spinharney fired four shots "[a]s fast as he could pull the trigger." 890 F.2d at 275. At trial, Seme testified consistently, although estimating the two men's original distance at 10 feet with Zuchel's taking three steps before Officer Spinharney fired shots. *Zuchel II*, 997 F.2d at 736. Finally, in *Zuchel I*, we cited Officer Rathburn's testimony that she had seen no weapon in Zuchel's hand. 890 F.2d at 275. At trial, she gave more complete testimony, some favoring the plaintiffs' claims, including that she and Officer Rathburn were about 15 feet from Zuchel, that she was surprised to hear gunshots because she did not expect Officer Spinharney to shoot, and that she was "right next to Mr. Zuchel when he was shot because she was intending to "grab him in some fashion or try to get him physically under some control until my partner could, you know, assist me." *Zuchel II*, 997 F.2d at 736 (citation omitted).

With similar evidence supporting the plaintiffs on summary judgment and at trial, I am unsurprised we affirmed the jury verdict just as we had affirmed the earlier denial of summary judgment. Rather than explaining our two affirmances as resulting from our giving the plaintiffs the benefit of disputed facts and the inferences from the evidence, the majority unwarrantedly speculates that the *Zuchel II* court might have "thought it was necessary for the jury to disbelieve the testimony that [the shooting officer] had told the plaintiff to drop his weapon." Maj. Op. at 12. I see nothing in *Zuchel I* or *II* suggesting that the officer's command to "drop it" was ever even disputed. Moreover, in view of our de novo review in *Zuchel I* and *II*, I cannot fathom the majority's conclusion that "the more natural reading of our opinion is that any discrepancies among the witnesses were irrelevant." Maj. Op. at 12. In addition to all else, *Zuchel II* itself defeats this

6

interpretation. As adequate support for the jury's excessive-force finding, we relied on the coroner's testimony about Zuchel's arm position when shot (arm across chest) "*along with the evidence recited above . . . .*" *Zuchel II*, 997 F.2d at 736 (emphasis added). If the bulk of the recited evidence was irrelevant, this would be a strange way for the *Zuchel II* court to say so.[1]

In addition, if the majority is correct that the only relevant facts in our case are whether Tenorio charged the officers and slashed or stabbed with his knife, I would have expected to see that minority-of-circumstances approach applied in later cases involving an officer's fatal shooting of a knife-wielding man. But in *Estate of Larsen*, 511 F.3d at 1260, which we decided three years after *Walker*, the court did just the opposite. There, applying an objective-reasonableness standard, the court again applied a broad analytical framework and compiled a list of non-exclusive factors based, in part, on *Walker* and *Zuchel I*: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the

---

[1] *See King*, 2015 WL 3875551, at \*7 (noting that the court in *Zuchel I* affirmed a denial of summary judgment on qualified-immunity grounds to the shooting officer because of "conflicting testimony in [*Zuchel I*] concerning what provoked the shooting"); *Zia Trust Co. v. Montoya*, 597 F.3d 1150, 1154–55 (10th Cir. 2010) (affirming denial of qualified immunity to the shooting officer at summary-judgment stage despite his own favorable testimony because "reading the record in the light most favorable to plaintiffs, it is not clear that [the decedent] manifested an intent to harm Officer Montoya or anyone else at the scene"); *Sevier v. City of Lawrence*, 60 F.3d 695, 700 (10th Cir. 1995) (affirming denial of summary judgment on qualified-immunity grounds to shooting officer in part based on disputed evidence about whether shooting victim had lunged at officer with a knife).

7

suspect; and (4) the manifest intentions of the suspect." 511 F.3d at 1260 (citing *Walker*, 451 F.3d at 1159; *Jiron v. City of Lakewood*, 392 F.3d 410, 414–15 (10th Cir. 2004); *Zuchel I*, 890 F.2d at 274). In doing so, the court looked at far more facts than charging, stabbing, and slashing to determine whether the officer had shown probable cause of serious physical harm to himself or others.

Even under the majority's shrunken analytical framework, I still cannot understand its bases for denying qualified immunity in this case. Although the majority apparently contends that Tenorio was not "charging" the officers, Maj. Op. at 12, I fail to see the difference between "charging" the officers and advancing toward them with a knife without pausing or breaking stride. I suspect that officers would much prefer a "charging" suspect from twenty feet away to a "non-charging" Tenorio advancing on them in a sixteen-foot room with a difficult retreat.[2] In this situation, we need to recognize the immediacy of the life-threatening danger to the officers. As I understand the majority's new approach, Tenorio was free to get right up to the officers so long as he did not "charge" them while making stabbing or slashing motions with the knife. This ill-conceived approach ignores how quickly a knife-wielding man can thrust a knife and kill or grievously wound an officer or a bystander. It also fails to recognize the danger to the officers and Tenorio's family had Tenorio gotten close enough to wrestle Officer Pitzer for his gun. Guns can fire in melees—accidentally or otherwise. The majority's let's-

---

[2] Although the majority relies on *Walker*'s characterization of *Zuchel* as requiring "charging," I note that in *Walker* the court said that David Walker "was not *advancing* on anyone with the small knife" and that "David was not *advancing* on him and had not threatened him in any way. . . ." 451 F.3d at 1160 (emphasis added). I do not think the majority denies that Tenorio was "advancing" on Officer Pitzer before being shot.

hope-nothing-bad-happens approach leaves officers at grave risk, one we have not previously required them to take. *See Estate of Larsen*, 511 F.3d at 1260 (noting that a reasonable officer need not await the "glint of steel" before taking self-protective action, which, by then, is often too late).

In short, I believe the majority has derailed our qualified-immunity analysis from its previously sensible course, and rerouted it away from Supreme Court and Tenth Circuit precedent. Its quick knockout punch to qualified immunity absent charging, slashing, and stabbing precludes officers from firing shots even when a knife-wielding man gets within, or extremely close to, stabbing range so long as he gets there by walking (not charging) and has positioned his knife for a quick thrust (without the fanfare of menacingly waving it before striking).

## C. The District Court's Analysis

Before explaining why I believe the district court erred in denying summary judgment for qualified immunity, I pause to review the facts that the district court found. In its order denying summary judgment, the district court found facts and adopted transcripts that provide additional undisputed facts:

- On November 11, 2010, at 7:56 p.m., Hilda Valdez, Tenorio's sister-in-law, called 911, saying, "I need someone to come over here right away." She said that Tenorio was intoxicated and holding a knife to his throat. She expressed fear that he would hurt himself or his wife. She advised that he had broken some windows and was saying that he was going to slice his throat. She again said that "I'm afraid he's gonna hurt his wife." Later, she repeated that he was threatening to kill himself and expressed fear that he might "do bodily harm" to his wife. She said he was waving around a very sharp knife. The dispatcher tried to calm her, telling her to take a deep breath. Ms. Valdez said, "Please hurry! Please hurry! Oh, god. Oh, god. Oh,

9

god." Right before the officers arrived, Ms. Valdez said, "I'm outside and she's yelling." Appellant's App. at 65–66, 71, 204.

- The 911 operator relayed this information to the police dispatcher, who broadcast that Ms. Valdez had called about her brother-in-law Tenorio's placing a knife to his throat. The dispatcher further advised the officers that Tenorio "has been violent in the past" (a mistaken characterization) and "takes meds for seizures." Additionally, the dispatcher advised that Tenorio was in the kitchen "[waving] the knife around" but that no injuries had been reported. Finally, the dispatcher advised that Tenorio's wife and Valdez were in the living room, and that Tenorio and his brother were in the kitchen. Appellant's App. at 73–74, 204–05.

- At about 8:03, the officers arrived and parked down the street. Within a minute or so, the officers spoke to Ms. Valdez, who clearly appeared frightened. On Pitzer's belt recorder, Ms. Valdez is heard saying, "He's got a knife. He's been drinking . . . ." Appellant's App. at 205.

- No officer asked if Tenorio had taken hostages, and the district court found that Officer Pitzer, lacking any crisis-intervention training, "immediately" announced "going lethal."[3] Then, without announcing their presence as police officers, the officers lined up and entered the home through the open front door. Although Officer Moore was in charge, Officer Pitzer was first in line, followed by Officer Moore with a Taser, Officer Liccione with a handgun drawn, and Officer Hernandez with a shotgun loaded with beanbag rounds. Appellant's App. at 205–06.

- The home's doorway sits directly across from the kitchen door through a furnished living room measuring 16 by 14 feet. When the officers entered, a lamp was on. The officers heard no raised voices or other sounds suggesting a disturbance. When Officer Pitzer saw Mrs. Tenorio through the kitchen doorway, he called out to her, "Ma'am, please step out here. Let me see your hands, okay?" As she came forward into the living room, she said to someone behind her, "Russell, put that down." She entered the living room with her hands up and her palms facing the officers. Behind her came Tenorio with a "blank stare," carrying a santoku-style kitchen knife with a 3 1/4 inch sheepsfoot blade. Tenorio's brother-in-law followed him into the living room. Officer Hernandez "hustle[d] [Mrs. Tenorio] out the front door." Appellant's App. at 206–07.

---

[3] The district court did not find that this had any particular meaning. In reviewing the record, I see that it is simply a way the police communicate to each other which officer will proceed first carrying a lethal weapon as opposed to Tasers or beanbag rounds.

10

- Tenorio walked forward into the living room at an "average" speed. Officer Pitzer saw the knife and yelled, "Sir, put the knife down! Put the knife down, please! Put the knife down! Put the knife down!" After Tenorio continued about two-and-a half-steps into the living room, Officer Pitzer fired his gun. At the same time, Officer Moore fired his Taser, also striking Tenorio. The shooting occurred less than four minutes after the officers arrived. Appellant's App. at 207.

   1. Probable Cause to Believe Tenorio Presented a Threat of Serious Physical Harm to Others

The district court correctly identified the *Estate of Larsen* factors as useful in determining whether Officer Pitzer was entitled to qualified immunity. Acknowledging that the four *Larsen* factors were "nonexclusive," the district court acknowledged that the factors seek to measure the danger presented by a knife-wielding person who is confronting officers. The district court considered the second factor as bearing on Tenorio's ability to harm others, and the other three factors as bearing on his intention to do so. I disagree with this approach. In my view, the distance between the officers and the knife-wielding Tenorio bears more than any other fact on Tenorio's ability to harm the officers.

Addressing the first factor (whether the officer ordered the suspect to drop his weapon and whether the suspect complied), the district court acknowledged that Officer Pitzer had "ordered [Tenorio] to drop the knife prior to shooting [him]" and that Tenorio had kept hold of the knife. Appellant's App. at 208. That is a bland account of a tense scene. As stated earlier in its opinion, an alarmed Officer Pitzer yelled the "drop-it" command four times in rapid succession. But the district court found this fact was "offset by

11

evidence that [Officer Pitzer] shot [Tenorio] within two or three seconds of the first command to drop the knife." *Id.* This, it concluded, was insufficient time to comply with the commands. Accordingly, the district court determined that a reasonable jury could find this factor neutral in determining probable cause of a danger of serious physical harm.

I disagree. Simply put, based on the district court's findings, Tenorio had time to comply. Had Tenorio not advanced toward the officers, or had he even stopped after beginning to do so, the officers could have given him more time to drop the knife. He, more than anyone, controlled the time Officer Pitzer could safely let pass before shooting. Tenorio's actions, and his actions alone, created the emergency requiring Officer Pitzer to protect himself, his fellow officers, and Tenorio's family. The district court nowhere says how much more time Officer Pitzer needed to give Tenorio to drop his knife (and whether Tenorio could have stabbed him or others before that time elapsed). Nor does the district court recognize any of the times Tenorio's family had tried to get him to put down the knife, including Mrs. Tenorio's saying to him, "Russell, put that down," as she entered the living room. Appellant's App. at 206. Tenorio had plenty of time to put the knife down, but Officer Pitzer had very little time to avoid a stabbing.[4]

Addressing the second factor (whether the suspect made any hostile motions with the knife), the district court said that Tenorio "was holding a small kitchen knife loosely by his thigh and that he made no threatening gestures toward anyone." Appellant's App. at

---

[4] In my view, the district court erred in either assuming that Tenorio's knife did not endanger the officers unless he had time to drop it (an action that would take little to no time at all) or that their safety was secondary to his having time to drop it.

208. Thus, it found that a reasonable jury could find this factor weighs against probable cause of danger. Again, I disagree. This factor seems inapplicable to this situation. Here, the immediate danger from Tenorio existed whether or not he gestured threateningly with the knife. Once Tenorio had gotten dangerously close to the officers, his previously not having waved the knife threateningly loses much of its significance. *See Estate of Morgan v. Cook*, 686 F.3d 494, 497–98 (8th Cir. 2012) (holding that officer had cause to believe that a suspect posed an imminent threat to officer when the suspect—who was 12 feet away—held a knife in his hand and tried to conceal it, and when the officer ordered him to drop it, he instead moved toward the officer).

Addressing the third factor (the distance between Tenorio and the officers when Officer Pitzer shot) the district court concluded that even this factor weighed against probable cause of serious physical harm. In my judgment, Officer Pitzer is entitled to summary judgment on qualified immunity based on this ground alone. Simply put, when Officer Pitzer fired his gun, he and others were endangered by Tenorio and his knife. Because so much depends on where Tenorio and Officer Pitzer were in the living room, I think any proper analysis needs to address that head-on. Here, we know that the four officers entered through the open front doorway into a furnished living room 16 feet long (toward the kitchen) and 14 feet wide. Officer Pitzer was first in the doorway. I cannot tell from the record where the furniture was in the room. I do know that once inside three officers must have situated themselves so that Officer Hernandez could grab Mrs. Tenorio and "hustle[] her out the front door." Appellant's App. at 207.

13

Because everyone agrees that Officer Pitzer was inside the living room, it is fair to say that his chest was at least two feet into the living room. Next, I note that the district court found that Tenorio had taken two-and-a-half steps[5] into the living room at an "average speed" toward Officer Pitzer as he yelled four times for Tenorio to drop the knife. *Id*. Because no one can stop mid-stride, this is the same as three steps. Even small steps at an average speed would stretch at least two feet each, so by the district court's findings Tenorio conservatively was at least six feet into the room. Finally, by raising and extending his arm, it's a fair estimate that Tenorio could have extended the point of the knife two feet in front of his body. Where does all that leave us? Even if Tenorio had stopped as he completed his third step—hardly a good gamble for officers concerned for their lives—quickly lifting his arm would in a split second have put the knife within six feet of Officer Pitzer's chest, and even closer to his arms, which were extended pointing his gun.[6] I cannot comprehend how that dire situation would not amount to probable cause of harm.

And, finally, addressing the fourth factor (the suspect's manifest intentions), the district court concluded that this factor did not support probable cause of harm because Officer Pitzer knew only that Tenorio had threatened himself and that Tenorio "did not raise the knife from his side or make threatening gestures or comments toward anyone." Appellant's App. at 209. Again, this cannot be the standard. Even if Tenorio—clutching a

---

[5] In his deposition, Tenorio said that he "took a couple—a few steps from the doorway into the living room" and later described it as "two and a half steps." Appellant's App. at 79–80.

[6] This account fully credits and relies upon the facts that the district court found.

knife he refused to drop even before the 911 call—had advanced toward the officers in the living room while grinning widely and thanking them profusely for helping his family, the officers would have been foolish to let him get too close. Unlike the district court, I think that in these circumstances Officer Pitzer was fully justified in believing Tenorio's advancing toward him with the knife showed a manifest intention to harm others. In evaluating Tenorio's actions, Officer Pitzer could also consider that, minutes earlier, Tenorio had been waving a knife and holding it to his throat, sufficiently frightening Ms. Valdez to call 911. The officers had also learned from the dispatcher that Tenorio had a violent history (although the dispatcher was mistaken). The officers also arrived to see a "clearly frightened" Ms. Valdez standing outside. Appellant's App. at 205. How much more danger is required to create probable cause of harm? Neither the majority nor the district court tells us.

Relying on a string-cite of cases and a mere recitation of the *Estate of Larsen* factors, the district court further concluded that Officer Pitzer should have known that his acts violated clearly established law. *See Plumhoff v. Richard*, 134 S. Ct. 2012, 2023 (2014). Under this second prong, "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id*. (citing *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011)). "In other words, 'existing precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate.'" *Id.* (quoting *Ashcroft*, 131 S. Ct. at 2080). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit

15

decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012) (citation omitted). Even so, our circuit uses a "sliding scale" system in which "the more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Pierce v. Gilchrest*, 359 F.3d 1279, 1298 (10th Cir. 2004).

The majority contends that *Zuchel II*, as construed in *Walker*, not only compels a conclusion of excessive force here but also "sets forth the clearly established law that resolves this case." Maj. Op. at 10. For the reasons I have already mentioned, I believe that Tenorio did not provide comparable favorable evidence to what the plaintiffs offered in *Zuchel II*, rendering that case no help to him in showing clearly established law. We must remember that the *Zuchel II* plaintiffs could rely on strong facts that would establish excessive force, including these:

- Police had responded to Zuchel's relatively minor public disturbance at a fast-food restaurant rather than to a family member's frantic 911 call;

- One eyewitness testified that Zuchel had been 6 to 8 feet from the shooting officer when shot, stating his view that "they were so far apart, . . . there was no one in danger at that time";

- Before being shot, Zuchel had taken three wobbly steps toward Officer Spinharney and was trying to explain what was going on in his argument with the teen bicyclists[7];

---

[7] As we reported in *Zuchel I*, one of the same eyewitnesses earlier said that Zuchel "was shot *after Zuchel stopped* and was trying to 'explain what was going on.'" 890 F.2d at 275 (emphasis added).

16

- While Zuchel pointed backwards at them with his left hand, the other officer saw that Zuchel had nothing in his right hand and was surprised to hear the shot because she was right next to Zuchel, getting ready to subdue him;

- Zuchel obviously had no knife visible because he was not carrying one (leaving a fact question whether the shooting officer might have seen that he was unarmed); and

- When the shooting officer first approached Zuchel from behind with gun drawn he announced his presence by telling that Zuchel that "you better shut up, or you're going to die."

*Zuchel II*, 997 F.2d at 735–36. Obviously, Tenorio alleges no such things. Because Tenorio's case is so much different from *Zuchel II*, I see no basis for our concluding that it is "beyond debate" that *Zuchel I* or *II* provided Officer Pitzer clear notice that his conduct amounted to excessive force.

By focusing exclusively on *Zuchel II*, the majority also disregards our cases presenting less immediate danger where we have affirmed summary-judgment grants of qualified immunity to other shooting officers. In measuring whether his split-second decision to shoot amounted to excessive force under clearly established law, Officer Pitzer could rely on those cases, too. For example, in *Estate of Larsen*, 511 F.3d at 1258–59, we affirmed a grant of summary judgment on qualified-immunity grounds to two officers who shot and killed a knife-wielding man. The man had earlier called 911 threatening to "kill someone or himself." *Id*. at 1258. As the officers approached Larsen's home, they saw him standing alone on his front porch, separated from the street by a small front yard, a three- or four-foot retaining wall, a six-step concrete walkway leading to the sidewalk with an iron rail down its middle, and shrubbery atop the retaining wall on one side of the stairs. *Id*. After seeing Larsen holding a large knife, the officers

17

commanded him to put it down. *Id.* Standing at a distance of 20 feet from the officers,[8] Larsen lifted the knife above shoulder-level and pointed it toward them. *Id*. at 1258, 1260–61. After earlier commands to drop the knife, one officer warned Larsen to "[d]rop the knife or I'll shoot." *Id*. at 1258. Upon Larsen's taking one step toward him, the officer, on the sidewalk below, fired twice, striking Larsen in the chest and killing him. *Id*. at 1258–59.

On appeal, we said that the excessive-force claim "center[ed] on whether Larsen posed an immediate threat to the officers or the safety of others." *Id.* at 1260 (citing *Jiron*, 392 F.3d at 414). We noted that "[d]eadly force is justified under the Fourth Amendment if a reasonable officer in Defendants' position would have had probable cause to believe there was a *threat of serious physical harm to themselves* or to others." *Id.* (emphasis original) (quoting *Jiron*, 392 F.3d at 415 (citation omitted)). In addition, we said that "[i]ndeed, even '[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back . . . the officer would be justified in using more force than in fact was needed.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)). Then we recited and generally applied the factors based on *Zuchel I* and *Walker*, recognizing that "in the end the inquiry is always whether, from the perspective of a reasonable officer on

---

[8] As we routinely do in summary-judgment cases seeking qualified immunity, we construed the record in the light most favorable to the plaintiff, the non-moving party. 511 F.3d at 1259 (citation omitted). So even though the shooting officer estimated his distance from Larsen as 7 to 12 feet, that would not control, because other competing evidence must have supported the court's finding that "the distance between [Officer] Murr and Larsen at the time of the shooting, though disputed, was somewhere between 7 and 20 feet." *Id*. at 1260–61.

18

the scene, the totality of the circumstances justified the use of force." *Id.* (citing *Sevier*, 60 F.3d at 699).

Thus, the court in *Estate of Larsen* applied the same four non-exclusive factors from *Zuchel I* and *Walker* as did the district court here. *Id.* (citing *Zuchel I*, 890 F.3d at 274; *Walker*, 451 F.3d at 1159). As "undisputed facts support[ing] the heightened immediacy of the threat they faced and the objective reasonableness of the use of deadly force[,]" the court relied on several facts also found in Tenorio's case: Larsen had already threatened violence against himself (and others although no one else was nearby); the officers responded to an emergency call late at night; the officers encountered a man armed with a knife; the officers told Larsen to put down the knife but he did not comply; the second officer was also prepared to use force and positioned himself to do so; and Larsen took a step toward an officer. *Id.*

On the other hand, the court in *Estate of Larsen* mentioned some other facts bearing on danger to the officers not found in Tenorio's case: Larsen's knife had a blade longer than twelve inches; Larsen "held the high ground" from his elevated porch; and Larsen raised and pointed the knife toward the officers. *Id.* at 1258, 1260. While the facts of all cases will differ in some regards, I do not believe the lack of these three facts deprives Officer Pitzer of summary judgment on qualified immunity. Giving Larsen the benefit of disputed fact issues, we must assume that he stood 20 feet from the officers when he took his first step. Plus, we must remember that the officers were outside and had the ability to safely retreat to avoid any need to use deadly force. In *Estate of Larsen*, no other people were at risk. And, of course, Larsen had to negotiate steps, hedges, and other obstacles

19

before reaching the sidewalk where the officers stood. Based on all the circumstances, I believe it clear that Officer Pitzer was far more at risk of immediate serious bodily harm than were the officers in *Estate of Larsen*. That being so, I cannot see how Officer Pitzer does not get summary judgment on qualified-immunity grounds when the officers in *Estate of Larsen* did. Even more basically, I cannot see how Tenorio can show any excessive-force claim was clearly established under law when the court in *Estate of Larsen* found "the officer's use of force was objectively reasonable." *Id.* at 1261.

2.  Reckless and Unreasonable Creation of Dangerous Situation

The district court found that Tenorio had presented evidence that "[t]he dispatcher had informed the officers shortly before they arrived that the two women inside Plaintiff's residence were in the living room, not in the kitchen, and when the officers arrived, Ms. Valdez was waiting in the driveway." Appellant's App. at 210. From this, the district court surmised that "[Officer Pitzer] and the other officers knew or should have known that they were not confronting a situation in which Plaintiff was holding persons inside against their will." *Id*. The district court noted that the officers "did not ask Ms. Valdez about the situation inside the house." *Id.* Apparently because the dispatcher did not relay Ms. Valdez's repeated concerns that Tenorio might injure his wife, the district court removed that fact from consideration. In addition, the district court criticized the officers for not "formulat[ing] a tactical plan prior to entering the residence." Appellant's App. at 212. Finally, the district court noted that the officers could tell by looking inside the home that upon entering that the small room and its furnishings would make it "difficult or impossible . . . to maneuver once they were inside." Appellant's App. at 211. Based on

20

this evidence, the district court concluded that "a reasonable jury could find that Defendant and the other officers acted recklessly by barging into the residence with deadly force deployed." Appellant's App. at 212.

In my view, the district court ignored the importance of the officers' impressions after interacting with a frantic and "clearly frightened" Ms. Valdez and after hearing that an intoxicated, window-breaking, man with a violent history[9] had been waving a knife around in the home with family members nearby. Those facts alone justified the officers' entrance into the home to separate the family members from the possible threat. They were well on their way to doing so when Tenorio entered the living room and headed for the officers.[10] For Officer Pitzer to avoid liability, the district court seems to require that the officers have "attempt[ed] to resolve the situation verbally (as for example by calling into the residence directing the occupants to come outside) . . . ." Appellant's App. at 211. This runs counter to the rule that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. It also violates our own direction that "[w]e are not well-suited to act as a police supervisory board, making finely calibrated determinations of just what type of misbehavior justifies just what level of

---

[9] Although the dispatcher was incorrect about Tenorio's having a violent history, the officers acted properly in treating it as so as they responded to the urgent call.

[10] The district court did not mention the undisputed testimony of Robert Torrez, Tenorio's brother-in-law, who testified that upon hearing sirens approaching he kept trying to get Tenorio to put the knife away, and when he heard the police were outside the house, he told Tenorio, "'Russell, the police are here, you really need to put that down or it's not going to be good,' and he refused." Appellant's App. at 85.

21

response." *Cordova v. Aragon*, 569 F.3d 1183, 1190 (10th Cir. 2009). Imagine the criticism had the officers adopted the district court's policing strategy and an hour later Tenorio either killed or wounded himself or a family member.

As its sole case supporting Tenorio's alternate theory that "[Officer Pitzer] and the other officers recklessly and unreasonably created a situation giving rise to Defendant's resort to deadly force," the district court cited to *Sevier*, 60 F.3d 701 n.10. In *Sevier*, a father called police for assistance after seeing his son—despondent about troubles with his girlfriend—"sitting on the edge of his bed with a knife in his hand resting on his lap." *Id*. at 697. Particularly worrisome were the son's two previous suicide attempts. *Id*. Upon picking the lock on the son's bedroom door with the father's help, two officers opened the door, saw the knife on the son's lap, and drew their guns. *Id*. at 698. After declaring that he had done nothing wrong, the son then rose and stood in his bedroom doorway holding the knife. *Id*. What happened next was disputed. The officers said the son lunged at them with the knife, and the parents denied this. *Id*. Both officers fired their guns at the son, hitting him six times and killing him. *Id*.

In addition to their excessive-force claim, the parents had a second claim that the officers "acted recklessly and unreasonably in the events surrounding the seizure and that this conduct immediately led to the shooting." *Id*. at 700. Because the district court summarily concluded that genuine issues of material fact remained, the *Sevier* court examined the record to "determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed." *Id*. (quoting *Johnson v. Jones*, 515 U.S. 304, 319 (1995)). In one sentence, the court said that "the record reveals some

22

evidence upon which a jury could conclude that Defendants acted recklessly by confronting [the son] in the manner that they did after knowing that he was armed and distraught over problems he was having with his girlfriend, and without gathering more information on the situation." *Id.* at 701 n.10.

*Sevier* cannot support Tenorio's facts. Tenorio had frightened his family by his active resistance to putting the knife down and by his waving it around and holding it to his throat. Unlike the disputed lunging in *Sevier*, Tenorio's case involves a district court's finding that he entered the living room and walked directly toward the officers. While the police in *Sevier* had the luxury of time in which to involve others adept in dealing with similar situations, the officers called to Tenorio's house faced a more immediate challenge. As mentioned, they knew that Tenorio had scared Ms. Valdez to a degree that she called 911 and then frantically waved them over when they arrived. They also knew that the dispatcher had told them that Tenorio was drunk; that he had held a knife to his throat that evening; that he had vandalized house windows that evening; that he had a violent history; that Tenorio's wife and brother-in-law were with him in the house; and that Tenorio was in the kitchen waving the knife around. These circumstances presented much more of an emergency than did those in *Sevier*. I cannot see how the officers acted recklessly here in trying to get the two family members away from the knife-wielding Tenorio. Once that was accomplished, had he let that happen, the officers might well then

23

have been able to take the approach with Tenorio that the district court would mandate upon their arrival.[11]

D. *Conclusion*

For these reasons, I would reverse the district court's denial of summary judgment for Officer Pitzer and remand with instructions to grant Officer Pitzer qualified immunity.

---

[11] In its closing sentence addressing this claim, the district court says that "[o]n this evidence a reasonable jury could find that Defendant and the other officers acted recklessly by barging into the residence with deadly force deployed." Appellant's App. at 212. The district court's own findings contradict "barging in." It found that Ms. Valdez called 911 to enlist the police's assistance in dealing with Tenorio, who was drunk, had held a knife to his throat, had vandalized windows soon before the call, and was waving the knife around in the kitchen. The front door was open. The district court certainly makes no findings that Ms. Valdez or anyone else protested when the police lined up and proceeded into the house.